PER CURIAM.
Harrel Franklin Braddy appeals his first-degree murder conviction and sentence of death for the killing of Quatisha Maycock, as well as his convictions and sentences for related offenses. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm Bradd/s convictions and sentences.
I. BACKGROUND
The evidence presented at Braddy’s trial revealed the following facts. Shandelle Maycock, mother to then five-year-old Quatisha, testified that she first met Brad-dy and his wife Cyteria through a mutual friend from church. Shortly after their initial meeting, Braddy began showing up at Shandelle’s home alone, unannounced, and uninvited, staying for short periods of time with no apparent purpose. Shandelle testified that she initially thought of Brad-dy as a “nice person” and would occasionally ask him for small favors. Braddy once inappropriately placed his hand between Shandelle’s legs, but when Shandelle became angry and threatened Braddy with a knife, Braddy left her apartment and later apologized for his actions. Shandelle testified that Braddy never again made a sexual advance toward her.
On Friday, November 6, 1998, Braddy picked Shandelle up from work and drove her home. After Braddy left Shandelle’s apartment at approximately 5:30 p.m., Shandelle began to call around looking for a ride to pick up Quatisha, who was being watched by a family member. Shandelle had not found a ride by approximately 10 p.m., at which time Braddy returned to her apartment in a gold Lincoln Town Car that he had rented earlier in the day. Braddy told Shandelle that they needed to talk but agreed to first drive Shandelle to pick up Quatisha. After picking up Quatisha and returning to Shandelle’s apartment, Brad-dy again stated that he needed to talk to Shandelle. Shandelle agreed, but before Braddy could talk to Shandelle, the phone rang. Shandelle answered the phone, had a brief conversation, and, after hanging up, told Braddy that he needed to leave because she was expecting company. Shan-delle testified that this statement had been a lie — she had not been expecting company but simply wanted Braddy to leave because it was late and she was tired. Upon *823 being told to leave, Braddy immediately attacked Shandelle, threatening to kill her and choking her until she lost consciousness. Shandelle testified that when she regained consciousness, she was still in her apartment but Braddy again choked her until she passed out.
Shandelle’s landlord, who occupied the house to which Shandelle’s apartment was attached, testified that he heard shouting coming from Shandelle’s apartment shortly before midnight. When he looked outside a short time later, the landlord saw Brad-dy standing at the driver-side door of the Town Car and Quatisha standing by the passenger-side door. He did not see Shandelle.
Shandelle testified that when she awoke for the second time, she was in the back seat of a large car parked in her driveway. Quatisha was in the front passenger seat, and Braddy was in the driver’s seat. As Braddy began to drive, Shandelle told Quatisha that they were going to jump out of the car. Braddy warned Shandelle not to jump, but Shandelle nevertheless pulled Quatisha into the backseat and opened the door. When Braddy saw that they were about to jump, he accelerated and turned a corner, causing Shandelle and Quatisha to fall out of the car.
Braddy stopped the car, helped Quatisha back into the car, and put Shandelle in the trunk. Shandelle testified that she remained in the trunk for thirty to forty-five minutes while Braddy continued to drive, after which time the car stopped and Brad-dy opened the trunk. Braddy pulled Shandelle out of the trunk, threw her to the ground, and again choked her until she lost consciousness, all the while threatening to kill her and accusing her of using him. When Shandelle woke up, it was daylight and she was lying in a remote area surrounded by foliage. Shandelle walked to the road and flagged down passing motorists, who called the police.
Between 1:30 and 2:30 a.m. on Saturday, November 7, Braddy returned home in the Town Car. Cyteria testified that she was awakened when Braddy came home and, when she went to the door to meet him, saw Braddy wiping down the interior of the Town Car with a cloth. Cyteria also testified that the washing machine was running and that when she looked inside the machine, she saw the clothes Braddy had been wearing earlier that night.
On November 7, police spoke to Shan-delle at Glades Hospital, where she had been taken for treatment after being found on the side of the road that morning. Shandelle gave police her statement, along with the names and descriptions of Braddy and Quatisha. Detectives Giancarlo Milito and Juan Murías went to Braddy’s home to determine Quatisha’s whereabouts. Shortly after the detectives arrived at Braddy’s house, they observed him exit the house and drive away in the Town Car. The detectives followed Braddy to a gas station and approached him as he was pumping gas. When the detectives first asked Braddy about Quatisha, Braddy appeared calm and denied any knowledge of the situation. However, when the detectives informed Braddy that Shandelle was alive and had implicated him in Quatisha’s disappearance, Braddy turned pale, began to sweat, shake, and cry, and claimed to feel faint. Detective Milito testified that at this point, although Braddy was not under arrest, he placed Braddy in handcuffs for everyone’s safety because of “the history that I had of him.”
The detectives took Braddy to the Miami-Dade County Police Department and sent the Town Car to be processed. Detectives Otis Chambers and Fernando Suco began to question Braddy at approximately 9 p.m. on Saturday, November 7. *824 When the detectives asked Braddy if he would consent to giving DNA samples, Braddy stated that he knew his rights and •wished to be read his rights. Detective Suco, the lead investigator in the case, explained Braddy’s rights to him pursuant to Miranda v. Arizona, 384 U.S. 436, 461, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), through the use of a standard Miranda form, which Braddy signed and initialed appropriately. After Braddy indicated that he understood and waived his rights, Detective Suco obtained Braddy’s consent to take specimens for DNA samples and to search Braddy’s home and the Town Car. However, because Braddy hesitated before signing the last consent form, Suco also obtained search warrants for Braddy’s house and the Town Car.
Pursuant to both Braddy’s consent to search and the search warrant, police searched the Town Car on Sunday, November 8. After being only partially processed, however, the Town Car was mistakenly released back to the rental agency, where it remained for approximately a day. Police were able to recover the Town Car before it had been cleaned by the rental agency, and pursuant to a second search warrant signed on November 10, investigators removed the trunk liner for DNA testing. Shandelle’s blood was found on the liner.
Meanwhile, Braddy’s interview continued early into the morning of November 8. Although Braddy spoke to the detectives— becoming visibly agitated when talking about Shandelle — he divulged no information about Quatisha’s whereabouts. Feeling that they were not making any progress, the detectives took a break from the interview just before midnight on November 7. During the break, Detective Suco prepared Braddy’s arrest form and conferred with other detectives who were gathering information on the case. Having determined that Braddy was lying to them, based on information received from other detectives, the detectives reinitiated the interview at approximately 1:15 a.m. on November 8 and confronted Braddy about lying. Braddy responded by saying, “I can’t tell you. Even if I’m found innocent, my family will not talk to me again.” The detectives continued to question Braddy, but although there was some interaction, Braddy refused to answer questions about Quatisha and mostly “just sat there or ... would put his head down.”
At approximately 3 a.m. on November 8, Braddy asked to talk to Detective Chambers alone. The detectives complied, but after fifteen to twenty minutes of useless conversation, Detective Chambers brought Detective Suco back into the room. Shortly thereafter, both detectives escorted Braddy to the bathroom, which he had asked to use. While walking through the homicide office to and from the bathroom, Braddy appeared to be “looking around” and “seeing where he was at.” After returning from the bathroom, the detectives again left Braddy in the interview room while the detectives compared information with other investigators. The detectives resumed the interview at approximately 3:55 a.m. and again confronted Braddy with evidence that contradicted what Braddy had been telling them. For the next two hours, Braddy responded to questions but refused to talk about Quatisha’s whereabouts. At around 6:15 a.m. on November 8, in an attempt to evoke an emotional response and elicit information, the detectives lied and told Braddy that his mother had suffered a heart attack. Although Braddy became visibly upset at this information, he did not divulge any information about Quatisha.
Finally, at around 8 a.m. on November 8, Braddy told the detectives that he had left Quatisha in the same area where he *825 had left Shandelle. Braddy then stated that he was tired of talking to the detectives and said that if they did not believe his story, they could take him to jail. At this point, the detectives stopped the interview, relayed Braddy’s confession to their supervisor, and went to breakfast. The detectives returned to the interview room at approximately 11:30 a.m. with breakfast for Braddy. When Detective Suco walked into the interview room, Braddy was standing on a chair in the corner of the room with his shoes off. Braddy immediately jumped to the ground and, before Detective Suco could speak, said “I’ll take you to where I left her.”
The detectives drove Braddy north from Miami-Dade County on U.S. Highway 27, through Broward County and into Palm Beach County, to the site where Shandelle had been found, a scene which was already teeming with authorities. At Braddy’s direction, the detectives drove along the dirt roads and through the fields off the highway for approximately three hours, with other detectives following, but found no trace of Quatisha. At approximately 2:30 p.m., after detectives had been led on a vain search by Braddy for several hours, Detective Greg Smith physically pulled Braddy out of the car and pinned Braddy against the side of the car by placing his forearm across Braddy’s throat. Detective Smith held Braddy in this position for approximately fifteen seconds, demanding to know where Braddy had left Quatisha. Braddy gave no response — either verbal or physical — to Detective Smith’s use of force and emotional plea. Having received no information despite his use of force, Detective Smith, along with Braddy and several other detectives, resumed the search for Quatisha on foot. During the foot search, Detective Smith engaged Braddy in a general conversation regarding his family and hobbies. At one point, Braddy asked Detective Smith how long it would take a body in the water to surface, speculating that although he had left Quatisha alive, she might have fallen into the water after he left her.
At approximately 4 p.m. on November 8, Braddy admitted to Detective Pat Diaz that Quatisha was in fact at a different location. Braddy then directed several detectives to a section of Interstate 75 in Broward County known as Alligator Alley. Once at Alligator Alley, Braddy told detectives that he had left Quatisha alive on the side of the road at a bridge crossing over a canal. Braddy directed detectives to three such bridges — at highway mile markers 28, 30, and 33 — but could not be sure at which bridge he had left Quatisha. Brad-dy gave different reasons for having left Quatisha on the side of the road in the Everglades in the middle of the night, including that he did so because he was angry with Shandelle and because he was worried that Quatisha would tell people what he had done to Shandelle. Braddy also admitted that when he left Quatisha, he “knew she would probably die” and that when she had not been found by Sunday evening, she was probably dead.
After searching until dark on November 8 and finding no trace of Quatisha, detectives escorted Braddy back to the Miami-Dade County Police Department. Detectives took Braddy back to the interview room where he had originally been kept— a room that had not been touched since Braddy occupied it earlier in the day. Upon entering the room, detectives noticed that a metal ceiling grate in the corner of the room — directly above the chair on which Braddy had been standing earlier in the day — had been forcibly bent up on both ends. Braddy was taken to a different interview room and again questioned by detectives, but Braddy never admitted to killing Quatisha. On the morning of Monday, November 9, two fishermen *826 found the body of a child floating in a canal running parallel to Alligator Alley, around highway mile marker 34. The body was recovered, taken to the Broward County Medical Examiner’s office, and identified as that of Quatisha Maycock.
Dr. Joshua Perper, the Chief Medical Examiner for Broward County, was called to the scene where Quatisha’s body was found. He examined the body initially when it was brought out of the canal and later performed an autopsy. Dr. Perper testified that Quatisha’s left arm, which was missing when her body was discovered, had been bitten off by an alligator after Quatisha had died. Dr. Perper also testified that Quatisha had suffered “brush burn” injuries while she was alive, consistent with her having grazed against a hard, flat surface, such as falling out of a car and sliding on the road. Additionally, Dr. Perper testified that Quatisha had suffered alligator bites to her torso and head while she was still alive, although he concluded that she was probably not conscious at the time she was bitten. Quatisha had also suffered several injuries after she had died or while she was very close to death, including more “brush burns” and alligator bites, as well as injuries to her lips consistent with fish feeding on her corpse. Dr. Perper concluded that Quatisha’s death was primarily caused by blunt force trauma to the left side of her head, consistent with her either having fallen from a great distance or having been thrown onto a prominent, protruding object, such as the jutting rocks along the canal where her body was discovered.
At the conclusion of the guilt phase of Braddy’s trial, the jury found Braddy guilty of first-degree murder, attempted first-degree murder, two counts of kidnapping, burglary of a structure with an assault or battery therein, child neglect causing great bodily harm, and attempted escape.
At the penalty phase of trial, the State introduced victim impact evidence through statements from three relatives or close friends of the victim, including Shandelle, who testified that among other things, she had contracted Crohn’s disease as a result of Quatisha’s murder. Additionally, the State presented the following evidence of Braddy’s prior criminal history.
The State introduced the judgment and sentence from Braddy’s attempted first-degree murder, robbery, and kidnapping of Corrections Officer Jose Bermudez, as well as of Braddy’s ensuing escape. Ber-mudez testified that on September 14, 1984, he had been escorting Braddy from the courthouse to the jail after Braddy had been denied bond at a bond hearing. Braddy attacked Bermudez in a stairwell, knocking Bermudez to the ground and choking him until Bermudez lost consciousness. When he awoke a short time later, Braddy again choked him to unconsciousness. Bermudez woke up on the floor of a holding cell wearing only his socks and underwear, with Braddy’s handcuffs on the floor nearby. Braddy was nowhere to be found.
On September 25, 1984, while a fugitive from police, Braddy broke into the home of Joseph and Lorraine Cole, an elderly couple in Hollywood, Florida. Braddy hid in a closet but was later discovered by the couple and exited the closet with a gun drawn. Braddy ordered both victims into a bedroom and ordered them to lie on the bed. Braddy told Lorraine that she would have to drive him out of the area in the couple’s car in order to help him through blockades. While Braddy walked Lorraine to the garage, Joseph climbed through a window and ran to a neighbor’s house to call the police. When Braddy saw that Joseph had escaped, he *827 apparently changed his mind about taking Lorraine with him. He stole the Coles’ 1984 Ford station wagon and fled alone. Braddy’s fingerprint was found inside the Coles’ house, and both of the Coles positively identified Braddy in a photo lineup. Because the Coles could not be located to testify[1] at Braddy’s penalty phase, the State introduced evidence of the details of Braddy’s crimes against the Coles by having Detective Suco read the arrest affidavit from that case. The State also introduced the arrest affidavit and plea colloquy into evidence.
The State further introduced Braddy’s prior criminal history through the testimony of Griffin Davis. Davis testified that on the night of October 5,1984, he had exited a building to retrieve something from his car when Braddy approached him at gunpoint. Braddy forced Davis into Davis’s car, and the two drove onto U.S. Highway 27, with Braddy driving while keeping a gun trained on Davis. When both an oncoming car and a car behind Braddy flashed their lights, Davis capitalized on the distraction and jumped out of the car. Davis hid in a canal beside the road, while Braddy turned around and made three or four passes of the area with his gun hanging out of the window. Eventually, Brad-dy drove off and Davis made his way to police. The State introduced the judgment and sentence from Braddy’s burglary, robbery, and kidnapping of Davis.
For mitigation evidence, the defense presented expert testimony regarding Braddy’s ability to adjust to life in prison. Additionally, the defense presented testimony from Braddy’s family and a close friend to establish that Braddy was a good husband and father and that his death would be hard on the family. Braddy’s father testified that out of his six sons, Braddy was the only one who gave him trouble but that he loved Braddy nonetheless. Cyteria testified that despite Brad-dy’s shortcomings, she still considered him a good husband and father. She denied having knowledge of any extramarital affairs in which Braddy might have been involved. All of Braddy’s family members testified that his death would be hard on them individually.
On August 31, 2007, the jury recommended, by a vote of eleven to one, that Braddy be sentenced to death for Quati-sha’s murder. After conducting a hearing pursuant to Spencer v. State, 615 So.2d 688 (Fla.1993), the trial court sentenced Brad-dy to death. State v. Braddy, No. 98-37767 (Fla. 11th Cir. Ct. order filed Oct. 15, 2007) (Sentencing Order). In sentencing Braddy to death, the trial court found and gave great weight to the following five aggravating factors: (1) the victim of the capital felony was a person less than twelve years of age; (2) the capital felony was committed while the defendant was engaged in the commission of a felony crime, to wit: kidnapping; (3) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody; (4) the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP); and (5) the defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to another person. The trial court also considered but gave no weight to the fact that the *828 capital felony was especially heinous, atrocious, or cruel (HAC).
Braddy waived all mitigating factors,[2] with the exception of the catch-all “[a]ny other factors in the defendant’s background that would mitigate against imposition of the death penalty” (nonstatutory mitigation). § 921.141(6)(h), Fla. Stat. (1997). In his sentencing memorandum, Braddy listed sixty-seven items of nonstat-utory mitigation, which the trial court grouped by topic into nine categories of nonstatutory mitigation. The trial court evaluated and considered each item in each grouping and the grouping itself in determining what weight to accord them, ultimately giving little or moderate weight to eight of the categories: (1) Braddy had adjusted well to prolonged confinement in his previous incarcerations and might possibly be rehabilitated — little weight; (2) the sentence of life imprisonment was available to the court — little weight; (3) Braddy conducted himself in an appropriate manner at trial — moderate weight; (4) the friends in Braddy’s life considered him to be of value — little weight; (5) Braddy’s wife and children supported him unconditionally — moderate weight; (6) Braddy’s execution would presumably have an extreme impact on his family and friends— little weight; (7) Braddy’s parents and siblings considered him to be an important member of the family and believed that his life could be of value to other members of the family — little weight; and (8) Braddy attended church and professed dedication to Christian principles and beliefs — little weight. The trial court also considered but gave no weight to the fact that Braddy did not sexually molest Quatisha. Ultimately, the trial court determined that the aggravating factors outweighed the mitigating factors and gave great weight to the jury’s recommendation of death. For the other counts of which Braddy was convicted, the trial court sentenced Braddy to three life sentences and fifty years in state prison, with the sentences to run consecutive to each other and to the death sentence.
In this appeal, Braddy challenges several aspects of both his guilt and penalty phase trials. Braddy argues that (A) the trial court erred in denying Braddy’s motion to suppress evidence obtained in violation of his right to remain silent and his right to an attorney; (B) the trial court erred in failing to timely rule on and ultimately denying Braddy’s motions to disqualify the trial judge; (C) the State failed to establish the venue alleged in the indictment for the charges of murder and attempted murder; (D) the trial court erred in admitting into evidence the second search warrant for the Town Car and the accompanying affidavit; (E) the trial court erred in denying Braddy’s motion for mistrial based on Detective Milito’s prejudicial testimony regarding Braddy’s prior criminal history; (F) the trial court erred in allowing the State to engage in improper argument during its guilt phase closing argument; (G) the evidence is legally insufficient to support Braddy’s con *829 victions for burglary, child neglect, and attempted escape; (H) the trial court erred in allowing the State to engage in improper argument during its penalty phase closing argument; (I) the trial court erred in requiring Braddy to argue all nonstatutory mitigation as a single mitigating factor; (J) the trial court erred in allowing the State to present victim impact evidence that Shandelle had contracted Crohn’s disease as a result of the murder; (K) the trial court erred in allowing the State to introduce impermissible hearsay evidence to prove Braddy’s prior felony convictions; (L) the trial court erred in sentencing Braddy to death because Florida’s capital sentencing proceedings are unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); and (M) the cumulative effect of the above errors deprived Braddy of due process and a reliable sentencing proceeding. In addition to considering Braddy’s arguments on appeal, we review the record to confirm (N) that sufficient evidence supports Braddy’s conviction for first-degree murder and (0) the proportionality of the imposition of the death penalty. See Fla. R.App. P. 9.142(a)(5).
II. ANALYSIS
A. Motion to Suppress
Braddy filed a motion on June 4, 2007,[3] asking the trial court to suppress, inter alia, all statements that Braddy made to police on November 7 and 8, 1998, as well as “all post arrest/custody observations of the Defendant by all police officers participating in the investigation of the case on November 7th and 8th, 1998, the Defendant’s identity, and all tangible evidence unlawfully seized from the Defendant.” At a hearing on June 18, 2007, the trial court denied Braddy’s motion to suppress, determining that the information which Braddy sought to suppress was legally obtained. Braddy now argues that (1) the form used by detectives to advise Braddy of his Miranda rights failed to inform Braddy that he had the right to consult with counsel before his interrogation; (2) the police failed to scrupulously honor Braddy’s right to remain silent; and (3) the police resorted to physical force in order to elicit incriminating statements from Braddy.
The trial court’s ruling on Braddy’s motion to suppress comes before us “clothed with the presumption of correctness,” such that we “interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustain the trial court’s ruling.” McNamara v. State, 357 So.2d 410, 412 (Fla.1978). Thus, we “accord a presumption of correctness to the trial court’s rulings on motions to suppress with regard to the trial court’s determination of historical facts” and will only reverse the trial court’s factual findings if such findings are not supported by competent, substantial evidence in the record. Connor v. State, 803 So.2d 598, 608 (Fla.2001). However, we “independently review mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the Fourth and Fifth Amendment[s] and, by extension, article I, section 9 of the Florida Constitution.” Id.
Having determined that the trial court’s findings of fact are supported by competent, substantial evidence in the record, we treat such findings as correct when reviewing Braddy’s claims. We find no merit in Braddy’s claims and therefore affirm the trial court’s denial of Braddy’s motion to suppress.
*830 1. Miranda Form
The Metro-Dade Police Department’s Miranda warning form states, in relevant part:
3. If you want a lawyer to be present during questioning, at this time or anytime hereafter, you are entitled to have the lawyer present. Do you understand that right?
Braddy initialed that he understood this right and signed the bottom of the form, indicating that he had been neither coerced nor induced to sign the form. We have previously upheld this specific form as sufficient. Chavez v. State, 832 So.2d 730, 750 (Fla.2002) (citing Cooper v. State, 739 So.2d 82, 84 n. 8 (Fla.1999) (approving the warning on the Metro-Dade Miranda form that states, “[i]f you want a lawyer to be present during questioning, at this time or any time thereafter, you are entitled to have a lawyer present”)); see also Johnson v. State, 750 So.2d 22, 25 (Fla.1999). Braddy argues, however, that we should reconsider these opinions in light of our more recent opinion in State v. Powell, 998 So.2d 531 (Fla.2008), rev’d on other grounds, 559 U.S. 50, 130 S.Ct. 1195, 175 L.Ed.2d 1009 (2010) (Powell I).
In Powell I, we held that Miranda warnings advising a defendant of both his right to consult counsel “before any questioning” and his right to invoke any of his rights at any time during the interview were insufficient to inform the defendant of his right to have a lawyer present during questioning. 998 So.2d at 540. The Supreme Court disagreed. Florida v. Powell, 559 U.S. 50, 130 S.Ct. 1195, 1198, 175 L.Ed.2d 1009 (2010) (.Powell II) (holding that the two separate warnings “reasonably conveyed the right to have an attorney present, not only at the outset of interrogation, but at all times”). Thus, not only was our decision in Powell I overruled by the Supreme Court, but the Miranda warnings in that case are distinguishable from those in the Metro-Dade Miranda form which we have expressly upheld in the past and again uphold today. Brad-dy’s claim therefore fails.
2. Invocation of Right to Remain Silent
Braddy next claims that police failed to scrupulously honor his right to remain silent. It is well established that where a defendant has received proper Miranda warnings and waived his Miranda rights, he must make an unequivocal or unambiguous request to terminate an interrogation in order to reassert those rights. State v. Owen, 696 So.2d 715, 719 (Fla.1997) (citing Davis v. United States, 512 U.S. 452, 461, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)). If a defendant’s attempt to revoke his waiver is ambiguous or equivocal, police are not required to either cease questioning or to clarify whether the defendant’s statement was in fact a reassertion of his Miranda rights. Id. A revocation “is unambiguous if a reasonable police officer under the circumstances would understand that the suspect is invoking the right.” Womack v. State, 42 So.3d 878, 883 (Fla. 4th DCA 2010). When determining whether a revocation is unambiguous, we consider “whether the response refers to specific questions about the crime or about the underlying right to cut off all questioning.” Id. (citing Cuervo v. State, 967 So.2d 155, 163 (Fla.2007)).
For example, a defendant who, at the outset of his custodial interrogation, stated “[n]o quiero declarar nada” — which was then translated to his interrogator as “[h]e does not wish to talk with us” — had unequivocally invoked his right to remain silent. Cuervo, 967 So.2d at 162. Conversely, a defendant who validly waived his Miranda rights but later responded to a question by saying “[m]an, I don’t really want to talk about that,” did not unequivo *831 cally invoke his right to remain silent. Bailey v. State, 31 So.3d 809, 811 (Fla. 1st DCA 2009). Likewise, a defendant who, when asked whether he had specifically targeted the victim’s house, responded “I’d rather not talk about it,” and later responded to another question with “I don’t want to talk about it,” did not unequivocally invoke his Miranda rights. Owen, 696 So.2d at 717 n. 4 (Fla.1997). Because it was “unclear whether [the defendant] was referring to the immediate topic of discussion ... or to the underlying right to cut off questioning,” the statements were ambiguous and police were not required to clarify the defendant’s intent. Almeida v. State, 737 So.2d 520, 523 (Fla.1999) (citing Owen, 696 So.2d at 719).
Here, the statements which Braddy alleges amount to unequivocal invocations of his Miranda rights are similar to the statements at issue in Bailey and Owen. When confronted by Detective Suco with the fact that Shandelle’s landlord had seen Braddy and Quatisha next to the Town Car on the night Quatisha went missing, Braddy responded “I can’t tell you. Even if I’m found innocent, my family will not talk to me again.” Not only was Braddy’s statement made in direct response to Detective Suco’s specific question regarding the landlord, but Braddy’s statement evinces a hesitancy to talk because of what his family might think of him rather than an invocation of his fundamental right to remain silent. Nor was Braddy’s ensuing silence an unequivocal invocation of his Miranda rights. Braddy cites Pierre v. State, 22 So.3d 759, 766 (Fla. 4th DCA 2009), for the proposition that silence can amount to an unequivocal invocation of the right to remain silent. Pierre, however, involved an unequivocal invocation—“I’m not saying anymore”—followed by silence. Id. at 766. Here, no such unambiguous statement was made.
Later, when speaking to Detective Chambers alone, Braddy indicated that he did not want to answer Detective Chambers’ questions because he did not want to incriminate himself. It is unclear based on this statement whether Braddy “was referring to the immediate topic of discussion ... or to the underlying right to cut off questioning.” See Almeida, 737 So.2d at 523 (Fla.1999) (citing Owen, 696 So.2d at 717). Because Braddy’s statement was ambiguous, Detective Chambers was not required to clarify whether Braddy was actually invoking his right to remain silent. See Owen, 696 So.2d at 719. Moreover, shortly after Detective Suco reentered the interview room, Braddy again asked to speak to Detective Chambers alone. Braddy’s multiple requests to speak to one detective but not the other belie his claim that he did not wish to speak to detectives at all.
Finally, after falsely informing Detectives Suco and Chambers that he had left Quatisha alive in the same area where he had left Shandelle, Braddy told the detectives that he was tired of talking and that if they did not believe him, they could take him to jail. This statement indicates Braddy’s desire to stop the interrogation for a time due to fatigue, as opposed to an unequivocal invocation of his fundamental right to remain silent. Moreover, this statement came directly on the heels of Braddy’s “confession.” Under the circumstances, a reasonable police officer would not have understood Braddy to be unambiguously invoking his right to remain silent immediately after supposedly volunteering the precise information police were seeking. Because Braddy did not unequivocally reinvoke his Miranda rights with this statement, Braddy’s claim that police failed to scrupulously honor his reinvocation is without merit.
*832 Therefore, because in none of these instances did Braddy unambiguously revoke his initial waiver of his Miranda rights, the trial court properly denied his claim.
3. Use of Physical Force
Braddy next argues that incriminating statements he made to police were the result of physical coercion and therefore involuntary. We have previously stated that “[w]here a defendant alleges that his statement was the product of coercion, the voluntariness of the confession must be determined by an examination of the totality of the circumstances.” Schoenwetter v. State, 931 So.2d 857, 867 (Fla.2006) (internal quotation marks omitted) (quoting Walker v. State, 707 So.2d 300, 311 (Fla.1997)). Here, the totality of the circumstances demonstrates that Braddy’s statements to police were voluntary, not coerced by Detective Smith’s act of physical force. Although Detective Smith’s use of force was highly inappropriate, the circumstances here demonstrate that Brad-dy’s subsequent incriminating statements were not the product of that use of force.
The trial court ruled that Detective Smith’s use of force was not “of such force and effect as to overcome [Braddy’s] will[, causing him] to immediately give up incriminatory evidence.” We agree. Shortly before 2:30 p.m. on Sunday November 8, Detective Smith pulled Braddy out of a police car, pushed him up against the side of the car, and held him there by placing his forearm across Braddy’s throat. The record shows that the entire incident lasted for ten to fifteen seconds. Yet it was not until about an hour and a half later, at approximately 4 p.m., that Braddy confessed to Detective Diaz that he had in fact lied to police and that he had left Quatisha in a different area. In the approximately ninety-minute period between when Detective Smith used force against Braddy and when Braddy confessed his lie to Diaz, Braddy had been leading detectives on a deceptive foot search for Quatisha. During this search, detectives were talking to Braddy about general topics such as his family and hunting in an effort to appeal to his humanity. Braddy’s confession, therefore, was insulated from Detective Smith’s use of force by an extended period of amicable conversation and was made to a detective other than the one who physically assaulted him. Moreover, any statements made to detectives during the foot search were not incriminatory because all such statements were made in furtherance of Braddy’s deception. Because the use of force — although highly inappropriate — did not coerce Braddy to make any incriminating statement, we hold that Braddy’s confession to Detective Diaz was voluntary.
B. Motions to Disqualify
Braddy next challenges the trial court’s ruling on two motions to disqualify. Brad-dy first argues that the trial court’s rulings were untimely and that, as a result, Brad-dy’s motions should have been deemed granted. Second, Braddy disputes the merits of the trial court’s rulings. We disagree on both counts.
1. Timeliness of Ruling
A motion to disqualify must be filed “within a reasonable time not to exceed 10 days after discovery of the facts constituting the grounds for the motion and shall be promptly presented to the court for an immediate ruling.” Fla. R. Jud. Admin. 2.330(e). Upon the filing of a motion, “[t]he judge shall rule on a motion to disqualify immediately, but no later than 30 days after the service of the motion as set forth in subdivision (c).” Fla. R. Jud. Admin. 2.330(j). Subdivision (c) states, in relevant part, that “[i]n addition to filing with the clerk, the movant shall immediately serve a copy of the motion on the subject judge as set forth in Florida Rule of Civil Procedure 1.080.” Fla. R. Jud. *833 Admin. 2.380(c). If the judge does not rule on a properly served motion “within 30 days of service, the motion shall be deemed granted and the moving party may seek an order from the court directing the clerk to reassign the case.” Fla. R. Jud. Admin. 2.330(j).
Here, Braddy appeals two of the eight recusal motions that he filed in this case— his October 11, 2006, motion, and his October 19, 2006, motion. These motions were ultimately denied by the trial court on June 18, 2007. In his October 11 motion, Braddy alleges judicial misconduct at an October 3, 2006, pretrial hearing. In his October 19 motion, Braddy alleges judicial misconduct at an October 11, 2006, pretrial hearing. At the end of his October 11 motion, Braddy certifies “that a true and correct copy hereof the foregoing motion has been furnished to [the prosecutor].” Likewise, in his October 19 motion, Brad-dy states, “I certify that a true and correct copy hereof has been furnished to [the prosecutor].” Each motion was filed with and stamped by the court clerk on the date that it was executed by Braddy. However, neither motion certifies that Braddy served a copy of his motions on the judge, as required by Florida Rule of Judicial Administration 2.330(c), and there is no evidence in the record suggesting such service occurred.[4]
On January 2, 2007, Braddy filed an emergency motion — which he served on both the prosecutor and the trial judge— asking the trial court to rule on the October 11 and October 19 motions to disqualify. At a hearing held on June 18, 2007, Braddy again requested that the trial court rule on the outstanding October 11 and 19 motions to disqualify. The trial court denied Braddy’s October 11 and October 19 motions on that same day.
The trial court’s ruling was timely. Although Braddy filed his October 11 and October 19 motions with the court clerk, he did not satisfy the requirement of rule 2.330(c) that a motion to disqualify be served on the judge “[i]n addition to filing with the clerk.” Because Braddy failed to comply with rule 2.330(c), the trial court was not bound by the thirty-day requirement of rule 2.330(j). See Hedrick v. State, 6 So.3d 688, 693 (Fla. 4th DCA 2009) (holding that because motions to disqualify were never served on judge as required by rule 2.330(c), such motions were not automatically deemed granted by rule 2.330(j) after 30 days).
Nor did Braddy’s January 2, 2007, emergency motion asking the trial court to rule on the October 11 and 19 motions subject the trial court to the thirty-day requirement. The thirty-day requirement of rule 2.330(j) applies only to motions that meet the substantive and procedural requirements of Florida Rule of Judicial Administration 2.330(c). See Fla. R. Jud. Admin. 2.330(j). Because Braddy’s January 2 motion was not a new motion to disqualify pursuant to the requirements of rule 2.330, it was not subject to the time constraints of rule 2.330(j). Accordingly, we hold that the trial judge’s denial of Braddy’s motions on June 18, 2007, was timely.
2. Merits
We review the trial court’s ruling on a motion to disqualify de novo. Chamberlain v. State, 881 So.2d 1087, 1097 (Fla.2004). “A motion to disqualify will be dismissed as legally insufficient if it fails to establish a well-grounded fear on the part of the movant that he will not receive a fair hearing.” Correll v. State, 698 So.2d *834 522, 524 (Fla.1997). “A mere ‘subjective fear’ of bias will not be legally sufficient; rather, the fear must be objectively reasonable.” Arbelaez v. State, 898 So.2d 25, 41 (Fla.2005). When determining whether Braddy’s fear was “well-grounded,” we look to see “whether the facts alleged, if true, would place a reasonably prudent person in fear of not receiving a fair and impartial trial.” Id. (quoting Fischer v. Knuck, 497 So.2d 240, 242 (Fla.1986)); see also Livingston v. State, 441 So.2d 1083, 1087 (Fla.1983).
In his October 11 motion, Braddy alleges that during an October 3 pretrial hearing, the trial judge exhibited antipathy towards him, including by angrily telling Braddy to “stop it,” refusing to let Braddy respond to the State’s arguments, and threatening to revoke Braddy’s right to proceed pro se.[5] The record shows, however, that Braddy continually tried to interrupt while either the judge or the State was speaking, despite the trial judge telling Braddy that he could talk “[i]n a minute,” and asking him to “[h]ang on for a second.” After Braddy continued to be disruptive, the judge became more stern, responding to Braddy’s interruptions with statements such as “[ejxcuse me. I’m not talking to you,” “this isn’t a cat fight,” and “[w]e went through this already. Stop it.” These comments, made in the course of the judge’s efforts to control the courtroom, are not legally sufficient to require disqualification. See Liteky v. United States, 510 U.S. 540, 556, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) (holding that “[a] judge’s ordinary efforts at courtroom administration — even a stern and short-tempered judge’s ordinary efforts at courtroom administration — remain immune” from motions to disqualify). Nor does the trial court’s threat to suspend Braddy’s right to represent himself require disqualification. See Faretta v. California, 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (explaining that “the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct”).
Likewise, the factual allegations contained in Braddy’s October 19 motion are not legally sufficient to require disqualification. Braddy claims that during an October 11 pretrial hearing, the trial court cut Braddy off and refused to allow Braddy to respond to the State’s arguments, establishing a pattern of rudeness and prejudice against Braddy. The record, however, shows that Braddy had the opportunity to argue his position before the court — specifically, whether Braddy could depose certain circuit judges and state attorneys. When Braddy asked the trial court for permission to speak, the trial court allowed Braddy to argue his case. It was only after the trial court denied Braddy’s request and Braddy continued to press the issue that the court cut Braddy off and refused to let him belabor the point. The trial judge’s comments to Braddy, even if exasperated or sharply spoken, do not require disqualification. See Liteky, 510 U.S. at 555-56, 114 S.Ct. 1147 (holding that “expressions of impatience, dissatisfaction, annoyance, and even anger” do not establish bias or partiality); see also Ragsdale v. State, 720 So.2d 203, 207 (Fla.1998) (holding that trial judge’s statements referring to defendant’s claims as “bogus,” “a sham,” and “abject whining” did not warrant recusal). We therefore affirm the trial court’s denial of Braddy’s motions to disqualify.
*835 C. Venue
Braddy next contends that his convictions for first-degree murder and attempted murder[6] must be reversed because the State failed to establish that the crimes on which those convictions were based occurred in Miami-Dade County, as alleged in the indictment. Braddy first raised this issue in a “Motion for Arrest of Judgment or in the Alternative Motion for Judgment of Acquittal” (motion for acquittal) filed on September 24, 2007 — more than two months after the jury convicted Braddy of these crimes and almost a month after the jury recommended that Braddy be sentenced to death for Quati-sha’s murder. At a hearing held that same day for the purpose of setting a date for Braddy’s Spencer hearing, the trial court orally denied Braddy’s motion for acquittal. The trial court failed to state any legal basis for denying Braddy’s motion. We review the trial court’s denial of Braddy’s motion for acquittal de novo. Reynolds v. State, 934 So.2d 1128, 1145 (Fla.2006).
The Florida Constitution provides that, “[i]n all criminal prosecutions the accused ... shall have the right ... to have a speedy and public trial by impartial jury in the county where the crime was committed.” Art. I, § 16(a), Fla. Const. To help protect this right, the State is required to allege the venue of each crime charged. Fla. R.Crim. P. 3.140(d)(3). We have recognized, however, that venue “is merely a privilege which may be waived or changed under certain circumstances.” Lane v. State, 388 So.2d 1022, 1026 (Fla.1980). And we have held that “failure to allege venue in an indictment or information is an error of form, not of substance and such a defect will not render the charging instrument void absent a showing of prejudice to the defendant.” Tucker v. State, 459 So.2d 306, 309 (Fla.1984).
Here, the indictment states that each of the crimes of which Braddy was ultimately convicted occurred “within the County of Miami-Dade, State of Florida.” At trial, however, the State introduced evidence establishing that although Braddy’s criminal activity originated at Shandelle’s home in Miami-Dade County, it then progressed to Palm Beach County, where Braddy choked Shandelle and left her in the woods, and finally to Alligator Alley in Broward County, where Quatisha was killed.
Section 910.05, Florida Statutes (1997), provides that “[i]f the acts constituting one offense are committed in two or more counties, the offender may be tried in any county in which any of the acts occurred.” For the death of Quatisha, Braddy was charged in the alternative with felony murder. The charge against Braddy for attempted murder with respect to Shandelle was also framed in the alternative as attempted felony murder. The predicate felonies for the felony murder and attempted felony murder charges were based on conduct which commenced in Miami-Dade County. Venue was thus properly laid under section 910.05 with respect to those offenses in Miami-Dade County.
In any event, Braddy’s objection to venue was untimely. Although the indictment was filed in November 1998, at no time prior to his July 2007 trial did Braddy object to venue in Miami-Dade County. Braddy did not object to the indictment at his arraignment on November 30, 1998, despite his counsel’s express recognition that “[t]here are three jurisdictions” involved. Nor did Braddy object *836 when, on October 3, 2006, the State filed a statement of particulars alleging that
[t]he location of the alleged offense was in or about the vicinity of [the address of Shandelle’s apartment in] Miami-Dade County, Florida, and/or the south side of Alligator Alley at or about Mile Marker 34 in Broward County, Florida and/or three miles north of U.S. 27 in Palm Beach County, Florida.
Instead, Braddy objected to this issue for the first time more than two months after his trial had concluded.
Braddy has offered no justification for his delay in raising the venue issue. And there is no possibility that the alleged error with respect to venue prejudiced Brad-dy in any manner. We reject Braddy’s argument on this issue.
D. Second Search Warrant
Braddy next challenges the trial court’s ruling regarding the State’s introduction into evidence of the second search warrant for the Town Car and the accompanying affidavit. Braddy argues that the warrant and affidavit constitute highly prejudicial hearsay evidence and violate Braddy’s constitutional right to confront the witnesses against him. We have “repeatedly held that ‘in order to preserve an issue for appellate review, the specific legal argument or ground upon which it is based must be presented to the trial court.’ ” Kokal v. State, 901 So.2d 766, 778-79 (Fla.2005) (quoting Bertolotti v. Dugger, 514 So.2d 1095, 1096 (Fla.1987)); see also Schoenwetter, 931 So.2d at 871 (holding that in order to preserve a Confrontation Clause challenge for appeal, a defendant must object on Confrontation Clause grounds in the trial court). Because Brad-dy’s counsel failed to state any legal grounds whatsoever when objecting to this evidence, we review the issue for fundamental error.
We find no error — fundamental or otherwise — in the trial court’s ruling. The search warrant and affidavit were not introduced for the purpose of establishing the truth of the facts contained therein. Instead, the documents were presented to establish a foundation for later evidence. The State introduced the affidavit to show that the search warrant was properly obtained and introduced the warrant to establish a foundation for any evidence obtained pursuant to the warrant. Braddy’s claim that the documents constitute inadmissible hearsay is therefore without merit. See, e.g., Breedlove v. State, 413 So.2d 1, 6 (Fla.1982) (noting that “[o]ut-of-court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted”) (quoting Anderson v. United States, 417 U.S. 211, 219, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974)).
Nor did the admission of the documents violate Braddy’s Confrontation Clause rights. As we have previously held, “the admission of a hearsay statement made by a declarant who does not testify at trial violates the Sixth Amendment if (1) the statement is testimonial, (2) the declarant is unavailable, and (3) the defendant lacked a prior opportunity for cross-examination of the declarant.” Blanton v. State, 978 So.2d 149, 154 (Fla.2008) (citing Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)). Because neither of the documents constituted hearsay evidence, neither crossed the threshold triggering Confrontation Clause analysis. Moreover, Detective Suco — the officer who had sworn the affidavit — was the witness through whom the affidavit was introduced at trial. We therefore determine that the trial court did not err in admitting the search warrant and affidavit into evidence.
*837 E. Motion for Mistrial
Braddy next challenges the trial court’s denial of his motion for mistrial based on Detective Milito’s reference in his testimony to Braddy’s “history.” We review a trial court’s denial of a motion for mistrial for abuse of discretion. Smith v. State, 7 So.3d 473, 502 (2009). “A motion for mistrial is addressed to the sound discretion of the trial judge” and should only be granted “in eases of absolute necessity” “when the error is so prejudicial and fundamental that the expenditure of further time and expense would be wasteful if not futile.” Ferguson v. State, 417 So.2d 639, 641 (Fla.1982) (internal citation omitted). Here, Braddy moved for a mistrial based on Detective Milito’s testimony regarding the events leading up to Braddy’s arrest:
[W]hen I noticed Mr. Braddy’s demean- or, how it changed, and for our safety, due to the circumstances, I placed handcuffs on him. I advised him I was going to handcuff him, he wasn’t under arrest at the moment, but it was for his safety and my safety dealing with the history that I had of him.
(Emphasis added.) Braddy argues that this statement was prejudicial because it informed the jury of his violent criminal past. The trial court disagreed, as do we.
Prior to the challenged testimony, Detective Milito had testified that he was dispatched to Braddy’s home after learning that Braddy had been implicated in a violent kidnapping, attempted murder, and possible murder of a child. Given this information and the change in Braddy’s demeanor upon being confronted, Detective Milito’s reference to Braddy’s history could most reasonably be interpreted in context as referring to the facts of the crime that was being investigated. The trial court therefore did not abuse its discretion in denying Braddy’s motion.
F. Guilt Phase Closing Argument
We review the trial court’s rulings regarding the propriety of comments made during closing argument for an abuse of discretion. Salazar v. State, 991 So.2d 364, 377 (Fla.2008) (holding that “[i]t is within the court’s discretion to control the comments made to a jury, and a court’s ruling will be sustained on review absent an abuse of discretion”) (quoting Ford v. State, 802 So.2d 1121, 1132 (Fla.2001)). If the trial court erred in allowing the prosecutor to engage in improper argument but there is no reasonable probability that the improper comments affected the verdict, such error is harmless and does not require reversal. Hitchcock v. State, 755 So.2d 638, 643 (Fla.2000). As for those comments to which Braddy did not object at trial but now appeals, we apply fundamental error review. Brooks v. State, 762 So.2d 879, 899 (Fla.2000) (defining fundamental error as that which “reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error”) (quoting McDonald v. State, 743 So.2d 501, 505 (Fla.1999)). Likewise, if Braddy made a contemporaneous objection which the trial court sustained but Braddy failed to move for a mistrial based on the improper statement, we review the unpreserved comment for fundamental error. Rose v. State, 787 So.2d 786, 797 (Fla.2001). We do not review each of the allegedly improper comments in isolation; instead, we examine “the entire closing argument with specific attention to the objected-to ... and the unobjected-to arguments” in order to determine “whether the cumulative effect” of any impropriety deprived Braddy of a fair trial. Card v. State, 803 So.2d 613, 622 (Fla.2001).
Braddy challenges a number of comments made during the State’s closing ar *838 gument. Several of the comments, however, were not preserved for appeal because Braddy either failed to object on the specific legal grounds that he now asserts or because, after having made objections that the trial court sustained, Braddy failed to move for a mistrial. None of the unpre-served comments rises to the level of fundamental eiror, nor does the cumulative effect of those unpreserved comments in which we identify possible error constitute fundamental error. Moreover, the comments that Braddy did preserve for appeal were properly ruled on by the trial court. Accordingly, having considered the State’s guilt phase closing argument as a whole, paying specific attention to the objected-to and unobjected-to comments, we deny Braddy’s claim.
1. Denigration of Defense
Braddy argues that throughout its closing argument, the State improperly attacked defense counsel and denigrated his defense. Specifically, Braddy challenges the State’s following comment regarding Braddy’s refusal to give a sworn statement to police:
Why would he refuse? I mean their whole thing is manipulation, misrepresentation. Of course he’s going to refuse. Because he thinks if it’s not in writing, he would not consider it, just like if the child’s body had not been found, he could not have been charged with murder.
Braddy also challenges the State’s comments that defense counsel must have been “in a different trial” because “[t]heir arguments make absolutely no sense,” as well as the State’s comments responding to the defense theory that Shandelle caused Quatisha’s death by jumping with her out of a moving car:
Again and again and again and again, from day one, this defendant has been trying to blame this victim. He’s been pinning in [sic] on all Shandelle May-cock. He’s doing it again. He’s trying to blame Shandelle Maycock for killing her child. If she hadn’t jumped out of the car, she wouldn’t — the child wouldn’t have died. That’s what they are telling you.
Braddy, however, failed to preserve an objection to these comments for appeal. Even if the comments are assumed to be improper, given the abundant evidence of Braddy’s guilt at trial, these comments— either individually or cumulatively — do not rise to the level of fundamental error. See, e.g., Chandler v. State, 702 So.2d 186, 191 n. 5 (Fla.1997) (holding that State’s comments at closing referring to defense counsel’s conduct as “cowardly” and “despicable” and calling defendant “malevolent ... a brutal rapist and conscienceless murderer” were “thoughtless and petty” but not fundamental error).
Braddy also challenges the State’s assertion that “nobody ever testified they saw [Braddy] with a belly belt.” Despite the State’s assertion, there was some testimony that Braddy was seen wearing a belly belt. Braddy claims that — because defense counsel suggested that Braddy had been restrained with a belly belt — the State’s comment amounted to an allegation that the defense had misrepresented the evidence. Braddy objected to this comment at trial, to which the trial court responded, “[t]he jury will recall the testimony that they heard about all of the issues, including this.” Because Brad-dy failed to obtain a clear ruling on his objection, he failed to preserve the issue for appeal. See Carratelli v. State, 832 So.2d 850, 856 (Fla. 4th DCA 2002) (noting that “[a] plethora of Florida cases support the notion that a party must obtain a ruling from the trial court in order to preserve an issue for appellate review”); see also Schreidell v. Shoter, 500 So.2d *839 228, 233 (Fla. 3d DCA 1986) (holding that “[fjailure to secure a ruling on an objection waives it, unless the court deliberately and patently refuses to so rule”). Even if the trial court’s comment could be interpreted as a clear ruling sustaining Braddy’s objection, Braddy failed to preserve the issue because he did not move for a mistrial. See Rose, 787 So.2d at 797. We therefore review the comment for fundamental error but find none in light of the totality of evidence of Braddy’s guilt.
Braddy also challenges the State’s comment that the defense “had to bring ... up” evidence of a fight that Shandelle had in 1997 with Quatisha’s uncle. Braddy objected but was overruled by the trial court. Braddy’s objection, however, was not made on any specific legal grounds and is thus unpreserved. See Brooks, 762 So.2d at 898. In any event, this statement, which Braddy claims denigrates the manner in which his counsel conducted his defense, was not improper. The challenged comment was made in response to the defense’s theory that persons other that Braddy had a motive for attacking Shandelle by pointing out that no other evidence supported such a theory. The comment was therefore within the wide latitude afforded to the State at closing to advance all legitimate arguments based on the evidence. See Smith, 7 So.3d at 509 (holding that the State has “wide latitude to argue to the jury during closing argument” and is entitled to draw “[[logical inferences” and advance “all legitimate arguments”).
2. Bolstering the State’s Witnesses
Braddy next challenges the State’s comments regarding the testimony of several police officers who had testified for the State. Defense counsel had repeatedly suggested during closing arguments that the police had fabricated their testimony in an attempt to frame Braddy. In response, the State argued that if the police had been lying, they could have done several things to make the lie more effective, including: (1) fabricating a sworn statement; (2) shooting Braddy in the back and claiming that he had tried to escape; (3) throwing Braddy into the canal for the alligators and claiming that he had fallen in; or (4) fabricating a total confession. Braddy claims that such argument improperly bolstered the State’s witnesses by implying that the' police were more truthful than other witnesses. Braddy failed, however, to object to the State’s comments and thus failed to preserve the issue for appeal. Moreover, the State’s comments were proper — and thus not fundamental error — because they were made in rebuttal to the defense’s closing argument and were a legitimate inference based in the evidence produced at trial. See Pagan v. State, 830 So.2d 792, 809 (Fla.2002) (holding that State’s comments during closing, based on the evidence, were not improper bolstering but rather fair rebuttal of defense closing argument); see also Smith, 7 So.3d at 509.
3. Braddy’s Exercise of His Constitutional Rights
Braddy next argues that several of the State’s closing comments improperly referred to Braddy’s choice to exercise his constitutional rights. First, Braddy argues that the State impermissibly commented on his decision to exercise his right to remain silent. Braddy challenges the State’s description of Braddy’s failure to tell police where he had left Quatisha as an attempt “to manipulate and stonewall and stretch things out,” as well as other references by the prosecutor to Braddy’s interrogation. Braddy, however, failed to object to these comments, and the comments were in any event not improper. The *840 record shows that the State was not commenting on Braddy’s exercise of his right to remain silent but rather on Braddy’s constant refusal to answer the officers’ questions truthfully while nonetheless carrying on conversation. This is demonstrated by the State’s reference to how Braddy “continue[d] to tell [officers] things that are simply not supported by the evidence, not supported by any of their investigation.” The State’s comments were therefore proper argument based in the evidence. See Smith, 7 So.3d at 509.
Second, Braddy challenges the State’s comment, made in reference to police testimony that Braddy had bonded with Detective Smith while they were searching for Quatisha, that “[t]here’s absolutely nothing to contradict it.” Braddy contends that because he was the only person who could have contradicted this testimony, this statement is thus “fairly susceptible” of being interpreted as a comment on Braddy’s failure to testify. Braddy failed to object to this statement. Because the State’s comment merely summarized the evidence introduced at trial, it was not improper and therefore not fundamental error. See Smith, 7 So.3d at 509.
Third, Braddy challenges the State’s comment describing Braddy’s hesitation before he signed the form consenting to let police search the Town Car. Braddy did not object to this comment at trial but now claims that it constitutes an improper comment on his decision to exercise his Fourth Amendment right to be free from unreasonable searches and seizures. Braddy’s argument is contradicted by the evidence, which shows that Braddy did in fact consent to the search. The challenged comment merely recounted evidence relevant to the context of that consent. It was not improper.
Fourth, Braddy challenges the State’s comment claiming that during the search for Quatisha, Braddy “was in charge of the situation ... [and] was the center of attention, just like he is right now.” Braddy failed to object to this comment at trial but now argues that it constitutes an impermissible comment on his decision to exercise his right to trial. However, the evidence established that Braddy manipulated police over the span of three counties for multiple days during the search for Quatisha. It is logical to infer that Braddy was both in charge of and the center of attention of a search conducted at his direction. It is equally logical to infer that the defendant at a capital murder trial is the center of attention. This was fair comment on the evidence. See Smith, 7 So.3d at 509.
4. Personal Attack Against Braddy
Braddy next challenges the State’s following line of argument regarding Braddy’s religion:
What do we know about this defendant as far as his loving and giving heart when it comes to giving aid? He describes himself as a religious man to Detective Suco, does he not? He can talk the talk, but he can’t walk the walk. Because if you’re religious, if you believe in the Good Book, then you live by the Word. The word of charity, the lack of selfishness.
Braddy argues that this invocation of religion was irrelevant to any legitimate issue and was used only to inflame the jury. Braddy failed to preserve this issue for appeal, so we review it only for fundamental error.
The record shows that the challenged argument was relevant to the State’s theory of motive. The evidence established that Braddy had once touched Shandelle in a sexual manner, began choking her when *841 he thought another man was coming to her home, and accused her of using him while choking her. Based on this evidence, the State argued that Braddy had become enraged at Shandelle and ultimately attempted to murder her because of his failure to attain a sexual relationship with her and his belief that someone else had. The State attempted to discount the defense’s theory that Braddy had befriended and aided Shandelle out of good Christian charity, asking the jury to consider why Braddy was “giving this aid to this woman and not telling his wife?” The State argued that the evidence contradicted the notion that Braddy had a loving and giving heart, pointing out that Bradd/s outward actions were contrary to the practice of Christian charity. The State’s comments directly responded to the defense theory and fall within the wide latitude afforded to advance all legitimate arguments based in the evidence.
5. Duty to Reject Lesser Included Offenses
Braddy next challenges the State’s reference to a “miscarriage of justice” in its comments regarding the charge of first-degree murder. The challenged comment occurred in the following context:
[STATE]: The defendant intended to kill her. He intended to kidnap her. He intended to kill her. To find him guilty of anything less than intentional premeditated first-degree murder, either by premeditation or felony would be to minimize what occurred.
[DEFENSE]: Objection, Your Honor.
[THE COURT]: All right. The objection is sustained. Rephrase it please.
[STATE]: To find him guilty of anything less would not be supported by the evidence, and it would be a miscarriage of justice.
(Emphasis added.) Braddy failed to make any objection at trial to the State’s reference to a “miscarriage of justice.”
It is — at least in some contexts— reversible error for a prosecutor to “exhort the jury to ‘do its job,’ ” because “that kind of pressure ... has no place in the administration of criminal justice.” United States v. Young, 470 U.S. 1, 18, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). Similar concerns regarding improper pressure on the jury are raised here by the prosecutor’s suggestion that finding Braddy guilty of a lesser offense rather than first-degree murder “would be a miscarriage of justice.” See United States v. Ingraldi, 793 F.2d 408, 415-16 (1st Cir.1986) (accepting government’s concession that prosecutor’s “statement that it would be ‘a miscarriage of justice to acquit’ ” was improper).
The potential for improper pressure on the jury here was diminished by the context in which the statement appeared. The State was recounting the evidence that supported a guilty verdict for each charge and advising the jury to follow the law as spelled out in each jury instruction. The prosecutor began this portion of his argument regarding the lesser included offenses by stating:
[I]t is your duty when you’re deliberating to review the evidence, make a determination that the State has proved the case beyond a reasonable doubt, prove each and every element of the crimes that are charged.... [Y]ou should find the defendant guilty of the highest crimes that the State has proved.
Assuming that the challenged statement was improper, we conclude that given the full context, this comment would not rise to the level of fundamental error.
*842 6. Misstating the Evidence
Braddy next claims that the prosecutor misstated the evidence by suggesting that Quatisha suffered “brush burn” injuries after death by being dragged by an alligator over the rocks along the edge of the canal. Braddy objected on the grounds that the argument was “not supported by the testimony,” and the trial court ruled that “[t]he jury will recall the testimony from the witnesses that testified about all of those points, including this point.” Braddy failed to obtain a clear ruling on his objection and thus failed to preserve the issue for appeal. See Carratelli, 832 So.2d at 856. Moreover, the State’s comment was not improper but was within the wide latitude afforded to advance all legitimate arguments supported by the evidence.
At trial, Dr. Perper testified regarding several of Quatisha’s injuries. Specifically, when asked whether certain “brush burn” injuries that Quatisha had suffered before death could have been caused by an alligator dragging her across rocks, Perper replied “[n]ot in my opinion, no.” However, Dr. Perper’s conclusion was only in reference to some of Quatisha’s “brush burn” injuries. Dr. Perper also testified that Quatisha had several similar “marks of basically like grazing skin around the surface” and that while “[s]ome of them have some blood,” others of “the same kind of pattern of grazing injuries” were white or yellow, which indicated perimortem or postmortem injuries. Additionally, Dr. Perper testified that Quatisha had suffered alligator bites after her death, including having one of her arms severed by an alligator. Therefore, although there was no direct evidence that Quatisha was dragged over rocks by an alligator, the State’s comment was permissible inference.
7. “Golden Rule” Argument[7]
Braddy challenges certain comments made by the State as improper “golden rule” arguments. “ ‘Golden rule’ arguments are arguments that invite the jurors to place themselves in the victim’s position during the crime and imagine the victim’s suffering.” Mosley v. State, 46 So.3d 510, 520 (Fla.2009). The State can comment on the crime as long as the comments “are based on evidence introduced at trial and are relevant to the circumstances of [the crime] or relevant aggrava-tors,” but may not “cross the line by inviting the jurors to place themselves in the position of the victim.” Id. at 521 (holding that the State’s comments describing victim trying to breathe as she was being suffocated and noting victim’s opportunity to contemplate death were not improper because comments were based on facts in evidence).
Braddy challenges the State’s use of the personal pronoun “you” when referring to Quatisha during closing argument. At trial, Braddy made no contemporaneous objection on this basis. In recounting the evidence, the State often used the personal pronoun “you” instead of “she”:
You’re five. You’d just seen what he’s done to your mother. You’re falling out of a moving car, you’re five and it’s dark. That’s terrifying.
[[Image here]]
You’re five. You jumped out of a moving car. You seen [sic] what he’s *843 done to your mother, and you’re terrified.
The State was certainly entitled to make comments recounting Quatisha’s last hours alive as supported by the evidence. See Rogers v. State, 957 So.2d 538, 549 (Fla.2007) (holding that State’s comments describing victim’s murder and last moments alive were not improper because based upon facts in evidence and were thus not golden rule arguments); see also Mosley, 46 So.3d at 520 (holding that the State’s comments describing victim trying to breathe as she was being suffocated and noting victim’s opportunity to contemplate death were not improper because comments were based on facts in evidence). But the form in which this recounting of the victim’s last hours was presented arguably “eross[ed] the line by inviting jurors to place themselves in the position of the victim.” Mosley, 46 So.3d at 521. The repeated use of the pronoun “you” suggests such an invitation. Assuming that these comments crossed the line to become an improper golden rule argument, those comments — in light of the totality of evidence presented at Braddy’s penalty phase trial — do not constitute fundamental error.
8. Cumulative Error Analysis
We have identified three aspects of the State’s guilt phase closing argument that raise concern: (1) the State’s comments denigrating defense counsel, specifically those accusing counsel of manipulation and misrepresentation, attacking the defense theory that Shandelle caused Qua-tisha’s death by jumping out of a moving car, stating that defense counsel must have been “in a different trial” because “[t]heir arguments make absolutely no sense,” and implying that defense counsel misrepresented the evidence regarding the belly belt; (2) the State’s comments that the jury would be committing a “miscarriage of justice” to convict Braddy of a lesser included offense instead of first-degree murder; and (3) the State’s comments describing Quatisha’s fear through the use of the pronoun “you.” Assuming these comments to be improper, we have determined that none of these comments individually amounts to fundamental error. However, “[w]e do not examine the allegedly improper comments in isolation.” Card, 803 So.2d at 622. Instead, we “examine[ ] the totality of errors in the closing argument and determinen whether the cumulative effect of the numerous improprieties deprived [Braddy] of a fair [trial].” Id.
Having considered the State’s comments made during the State’s guilt phase closing argument both individually and collectively, we conclude that any improprieties contained therein did not deprive Braddy of a fair trial. Although the prosecutor may have crossed the line by denigrating defense counsel’s theories and presentation of Braddy’s defense, the comments did not go to the heart of the case. Those comments accusing defense counsel of manipulation and misrepresentation, stating that “their arguments make absolutely no sense” and criticizing a specific defense theory — when viewed in the full context of this lengthy trial — were not sufficient to vitiate Braddy’s right to a fair trial. The trial court properly instructed the jury that statements made during closing argument did not constitute evidence to be considered in determining Braddy’s guilt. Also, because the evidentiary issue of the “belly belt” does not lie at the core of the State’s case against Braddy, any comments regarding that minor piece of evidence cannot be said to have prejudiced Braddy in any significant way. Moreover — given the context in which it was made — the prosecutor’s statement regarding a “miscarriage of justice” did not unduly pressure the jury to convict Braddy. Finally, even if the prosecutor improperly invited *844 the jury to place themselves in Quatisha’s position, the comments were not of such a nature as to cause the jury to convict Braddy against the weight of the evidence. Accordingly, we hold that the cumulative effect of any errors in the State’s guilt phase closing argument did not compromise the integrity of Braddy’s trial, and we deny relief on Braddy’s closing argument claim.
G. Sufficiency of Evidence: Burglary, Child Neglect, Attempted Escape
Braddy argues that the evidence against him is not sufficient to support his convictions for burglary, child neglect, and attempted escape. “In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” Simmons v. State, 934 So.2d 1100, 1111 (Fla.2006) (quoting Bradley v. State, 787 So.2d 732, 738 (Fla.2001)) (internal quotation marks omitted). Here, the evidence introduced at trial, when viewed in the light most favorable to the State, is sufficient to support Braddy’s convictions for burglary, child neglect, and attempted escape.
1. Burglary
“ ‘Burglary’ means entering or remaining in a dwelling, a structure, or a conveyance with the intent to commit an offense therein, unless the premises are at the time open to the public or the defendant is licensed or invited to enter or remain.” § 810.02(1), Fla. Stat. (1997). Burglary is a first-degree felony if during the course of the burglary, the defendant “makes an assault or battery upon any person.” § 810.02(2)(a), Fla. Stat. (1997). Here, the jury found Braddy guilty of burglary of a dwelling with assault or battery of a person therein. The evidence established that Braddy entered into Shan-delle’s home on the night of November 6 and, after Shandelle asked him to leave, choked her until she was unconscious. He then kidnapped both Shandelle and Quati-sha. Thus, although Braddy entered Shandelle’s home consensually, he satisfied the first prong of the burglary statute when he remained in her home after she expressly asked him to leave. Then, at some point while he was continuously remaining in her home, Braddy formed the intent to assault and batter Shandelle and to kidnap both Shandelle and Quatisha, thus satisfying the second prong of the battery statute and the first-degree aggra-vator. Viewed in the light most favorable to the State, a rational trier of fact could have found the elements of burglary beyond a reasonable doubt.
Braddy argues that because his entry into Shandelle’s apartment was consensual and because he did not remain in her home surreptitiously, his presence in Shandelle’s home did not fall within the conduct prohibited by the burglary statute. To support his claim, Braddy relies on our decision in Delgado v. State, 776 So.2d 233 (Fla.2000). In Delgado, the State had presented no direct evidence that the victims had expressly revoked their consent to the defendant’s presence in the dwelling, but instead sought to show that the victims had implicitly revoked their consent — thus making Delgado guilty of “remaining in” the home — by the fact that the defendant committed a crime against them. Id. at 239-40, 242. Reversing Delgado’s burglary conviction, we held that the phrase “remaining in” found in Florida’s burglary statute “should be limited to situations where the suspect enters lawfully and subsequently secretes himself or herself from the host.” Id. at 238. Here, however, the evidence established that Shandelle expressly revoked her consent by asking Braddy to leave her house because she *845 was expecting company. Braddy’s argument is therefore without merit. See Bradley v. State, 33 So.3d 664, 683 (Fla.2010) (noting that Delgado was not applicable because, inter alia, any possible consensual entry by defendant into victim’s home was “expressly revoked prior to the [defendant’s] opportunity to begin [his] attack on [the victim]”). Accordingly, we affirm Braddy’s burglary conviction.
2. Child Neglect
Braddy was convicted of child neglect causing great bodily harm, as set forth in section 827.03(3)(b), Florida Statutes (1997):
A person who willfully or by culpable negligence neglects a child and in so doing causes great bodily harm, permanent disability, or permanent disfigurement to the child commits a felony of the second degree.
“Neglect of a child” is defined in section 827.03(3)(a) as follows:
1. A caregiver’s failure or omission to provide a child with the care, supervision, and services necessary to maintain the child’s physical and mental health, including, but not limited to, food, nutrition, clothing, shelter, supervision, medicine, and medical services that a prudent person would consider essential for the well-being of the child; or
2. A caregiver’s failure to make a reasonable effort to protect a child from abuse, neglect, or exploitation by another person.
Neglect of a child may be based on repeated conduct or on a single incident or omission that results in, or could reasonably be expected to result in, serious physical or mental injury, or a substantial risk of death, to a child.
§ 827.03(3)(a), Fla. Stat. (1997). “ ‘Caregiver’ means a parent, adult household member, or other person responsible for a child’s welfare.” § 827.01(1), Fla. Stat. (1997). Braddy claims that he was not Quatisha’s caregiver and therefore cannot be guilty under the child neglect statute. We disagree.
Braddy admitted that he kidnapped Quatisha because — having also kidnapped Shandelle — it would have been child abuse to leave Quatisha home unattended. Braddy also admitted that he kept Quati-sha with him after disposing of Shandelle because it would have been child abuse to leave Quatisha with her incapacitated mother. Braddy therefore not only admitted to voluntarily taking responsibility of Quatisha but also claimed that he did so because to have done otherwise would have been child abuse. This evidence is sufficient to support a finding that Braddy was an “other person responsible for [Qua-tisha’s] welfare.” See State v. Nowlin, 50 So.3d 79, 82 (Fla. 1st DCA 2010) (holding that the phrase “other person responsible for a child’s welfare” is plain and unambiguous and thus must be given its “plain and obvious meaning”). We therefore affirm Braddy’s conviction for child neglect causing great bodily harm.
3. Attempted Escape
In order to prove the crime of attempted escape, the State was required to establish beyond a reasonable doubt that while Braddy was confined in or being transported to or from “any prison, jail, road camp, or other penal institution, state, county, or municipal,” Braddy attempted to escape from such confinement.[8] *846 See § 944.40, Fla. Stat. (1997). The State presented evidence at trial that (1) Braddy was confined at the Miami-Dade Police Department’s Homicide Office; (2) when detectives walked into the interview room after an extended break, Braddy was standing on a . chair in the corner of the room with his shoes off; (3) Braddy immediately jumped down off of the chair and offered to take detectives to where he had left Quatisha; (4) the metal ceiling grate directly above the chair was bent upward on both ends; and (5) when detectives escorted Braddy to the bathroom earlier in the night, Braddy appeared to be looking around to take note of his surroundings. Although this evidence is circumstantial, we “will sustain a conviction based solely on circumstantial evidence so long as the evidence is (1) consistent with the defendant’s guilt and (2) inconsistent with any reasonable hypothesis of innocence.” Jackson v. State, 25 So.3d 518, 531 (Fla.2009) (internal quotation marks omitted) (quoting Delgado, 948 So.2d at 689-90). Braddy argues that the circumstantial evidence on which his conviction was based is equally consistent with the theory that he was preparing to commit suicide. We disagree.
Braddy pushed both ends of the metal ceiling grate upward, maximizing the open space in the ceiling. Such an act is consistent with the theory that Braddy was attempting to gain access to the space above the ceiling and is inconsistent with the theory that Braddy was preparing to loop something through the grate in order to hang himself. Likewise, Braddy’s having taken his shoes off is consistent with the theory that he was preparing to silently crawl through the area above the ceiling but adds no support to the theory that he was preparing to commit suicide. Braddy also immediately jumped down from the chair when detectives reentered the room and spontaneously volunteered to take them to Quatisha. Braddy’s behavior is consistent with the theory that he was attempting to divert attention from his suspicious conduct. Finally, when Braddy was led through the police station after having requested a bathroom break, he appeared to be looking around, as if he was “seeing where he was.” This evidence is consistent with Braddy’s guilt by showing that Braddy was determining the spatial layout of the station in relation to his interview room. Therefore, because the totality of circumstantial evidence is inconsistent with the defense’s theory that Braddy was preparing to commit suicide, we affirm Braddy’s conviction.
H. Penalty Phase Closing Argument
Braddy next challenges several comments made during the State’s penalty phase closing argument. We review the trial court’s rulings on these comments for an abuse of discretion. Salazar, 991 So.2d at 377. If there is no reasonable probability that any preserved improper comments affected Braddy’s verdict, we will not reverse Braddy’s sentence. See Hitchcock, 755 So.2d at 643. Likewise if any unpre-served improper comments do not individually or cumulatively constitute fundamental error, we will not reverse Braddy’s sentence. Card, 803 So.2d at 622. Brad-dy failed to preserve several of the challenged comments for appeal, and none of the unpreserved comments constitutes fundamental error. Moreover, those comments which Braddy did properly preserve were either properly ruled on by the trial court or constitute harmless error. 'Therefore, having examined the entire closing *847 argument, paying specific attention to the challenged comments — whether preserved or not — we hold that the cumulative effect of any improper comments did not deprive Braddy of a fair trial.
1. Vouching for the Death Penalty
We have previously held that the State may not add legitimacy to its case by vouching for the death penalty during its closing argument. See Brooks, 762 So.2d at 901; see also Pait v. State, 112 So.2d 380, 384-85 (Fla.1959). In Pait, the prosecutor advised the jury during closing argument:
Before each murder trial that is prosecuted in this circuit, where I’m the State Attorney, a conference is held between me and my assistants to determine whether or not the facts in the case justify the State’s giving maximum punishment under the law.
I told you at the outset of this trial that if the facts in this case warranted this defendant being sent to the electric chair....
[At this point, defense counsel objected, interrupting the prosecutor in mid-sentence.]
Pait, 112 So.2d at 383-84. We held that the State’s comments “transcended the limitations of appropriate argument to the jury” by “giv[ing] the jury the benefit of the composite judgment of the State’s Attorney’s staff allegedly reached on the basis of investigations and discussions taking place before the trial.” Id. at 384-85. We concluded that the State’s comments were “highly inappropriate.” Id. at 384.
Similarly, in Brooks the prosecutor described the “death penalty weighing test” used by the State in deciding whether to pursue the death sentence, stating:
I would submit now that the State does not seek the death penalty in all first-degree murders because it’s not always proper, not always appropriate.... [But wjhere, under the facts of the case in the law of Florida, that death penalty weighing test is met, it is proper to seek a death penalty. And I would submit to you, when you look at all the facts of this case and look at the law of Florida, it is clear that this is a case that demands the death penalty.
Brooks, 762 So.2d at 901 (emphasis added). We held that “the trial court abused its discretion in overruling defense counsel’s objection [to] this line of argument.” Id. at 902. We concluded that although not as blatant as the remarks in Pait, the State’s comments in Brooks were irrelevant and tended to “cloak the State’s case with legitimacy as a bona-fide death penalty prosecution, much like an improper ‘vouching’ argument.” Id. Likewise, we recently held in Ferrell v. State, 29 So.3d 959 (Fla.2010), that defense counsel was deficient where counsel failed to object to the State’s “clearly impermissible” statement during penalty phase that
[t]he State doesn’t seek the death penalty in all first degree murders, it’s not always proper to do that.... But where the facts, where there are facts surrounding the murder that demand the death penalty, the state has an obligation to come forward and seek the death penalty. This is one of those cases.
29 So.3d at 987 (emphasis added).
In Pait, Brooks, and Ferrell, the prosecutors clearly appealed to the jurors to give weight to the fact that the State had decided to seek the death penalty. Here, however, the prosecutor did not make such a direct, unambiguous appeal.
Near the onset of penalty phase closing argument, the State made these comments:
*848 The death penalty is not applied to every murder ease. It just isn’t because, of course, each case is taken on its own merits. Each case is taken on its own fact. Each defendant is looked at for his own merits, his own background. Of course we’ll get to that later when we start to talk.
(Emphasis added.) Braddy objected to these comments on the ground that the State was improperly “[vjouching for their seeking the death penalty,” but the trial court overruled the objection. The State continued:
In determining that, where the State is seeking the death penalty, what we have to look at are those murder cases that are so egregious, those defendants who commit acts that are so egregious, who have backgrounds that are so bad that they have earned the death penalty.
We don’t just do it by putting the numbers in a computer. We take it to a jury of his peers, a jury of everyone’s peers. We all represent — you all represent everyone, him and everyone in this courtroom. We take it to you because we say all right, those are 12 people who are going to be able to weigh those factors.
The State’s burden is to prove the aggravators beyond a reasonable doubt. And the Legislature has set out what the determination is that the State has to make in bringing a case like this to you as a death penalty case, okay.
At this point, defense counsel again objected — this time on the ground of “improper argument” — in response to which the trial court directed the prosecutor to “[m]ove on to what you expect the evidence showed or has shown, please.”
Here, the State did not further “vouch” for its decision to seek the death penalty by claiming that “it is clear that this is a case that demands the death penalty,” Brooks, 762 So.2d at 901, or affirming that “[tjhis is one of those cases,” Ferrell, 29 So.3d at 987. The focus of the prosecutor’s remarks was on the responsibility of the jury to weigh the relevant factors, and the prosecutor did not invoke a direct, unambiguous appeal for the jurors to give weight to the fact that the State had decided to seek the death penalty. In the portion of the comments for which the objection was overruled, the prosecutor’s statement that “[t]he death penalty is not applied to every murder case” is reasonably understood as a reference to the legal framework governing imposition of the death penalty, rather than to the State’s determination whether to seek the death penalty. We thus conclude that the trial court did not abuse its discretion in overruling the objection to that portion of the argument.
The portion of the argument following the initial objection does contain a statement that bears some similarity to the type of argument we condemned in Pait, Brooks, and Ferrell. The prosecutor’s reference to “the determination ... that the State has to make in bringing a case like this to you as a death penalty case” raises concerns similar to those present in Pait, Brooks, and Ferrell, although the context — in which the focus is on the State’s burden to “prove the aggravators beyond a reasonable doubt” — tends to mitigate these concerns. In any event, defense counsel did not obtain a ruling on the objection to that portion of the argument or move for a mistrial. Assuming that the statement was improper, given the context, as an isolated comment, it would not constitute fundamental error.
2. “Golden Rule” Argument
Braddy next challenges several of the State’s comments made during penalty phase closing argument as improper *849 golden rule arguments. Braddy preserved the issue regarding some of the comments but failed to preserve it regarding other comments of which he now complains. As explained in section F. 7 (Guilt Phase Closing Argument: “Golden Rule” Argument) above, a prosecutor may not “invite the jurors to place themselves in the victim’s position during the crime and imagine the victim’s suffering.” Mosley, 46 So.3d at 520 (Fla.2009). The State is also prohibited from creating an imaginary first-person script depicting the victim’s suffering or death. Urbin v. State, 714 So.2d 411, 421 (Fla.1998) (holding that State used improper golden rule argument by recounting imaginary account of victim pleading for life, saying, “Don’t hurt me. Take my money, take my jewelry. Don’t hurt me.”).
Braddy first challenges the State’s comments — similar to those challenged in the guilt phase closing — that make use of the personal pronoun “you” when referring to Quatisha:
It’s dark, it’s pitch black. You’ve seen all of this. And then, you get thrown in.
[[Image here]]
... [Ijt’s even worse probably if you left her there to die and drive away and she fell in. You even have more time to think about it. You have more time to be afraid.
Braddy failed to object to these comments at trial. As noted above, the State was certainly entitled to make comments recounting Quatisha’s last hours alive as supported by the evidence. But the State’s repeated use of the pronoun “you” again arguably “cross[ed] the line by inviting the jurors to place themselves in the position of the victim.” Mosley, 46 So.3d at 521. Assuming that the State’s comments crossed the line to become improper golden rule arguments, the comments — viewed in light of the totality of evidence presented at Braddy’s penalty phase — do not constitute fundamental error.
Braddy did raise a golden rule objection to the following comments by the State:
But the time between U.S. 27 and when she gets hit in the head, I want you to go back there and sit for five minutes and let yourselves think of that fear.
The trial court sustained Braddy’s immediate objection to this comment, admonishing the State and instructing the jury to “disregard that last statement by the prosecutor, please.” Braddy preserved the issue for appeal by moving for mistrial. The trial court denied Braddy’s motion, reasoning that
[a]s to the Golden Rule argument, I think we caught it on time. Therefore, by giving the instruction to the jury that they must disregard the last statement of the prosecutor and sustaining the objection, I think that we dissipated any negative [e]ffect it might have had.
We review the trial court’s ruling for abuse of discretion. Smith, 7 So.3d at 502. Mistrial should only be granted “in cases of absolute necessity,” “when the error is so prejudicial and fundamental that the expenditure of further time and expense would be wasteful if not futile.” Ferguson, 417 So.2d at 641.
In Davis v. State, 928 So.2d 1089 (Fla.2005), in considering a claim of ineffective assistance of counsel, we held that the following comments made during the State’s closing argument were not fatally prejudicial to the defendant:
[The victim] would have been conscious for approximately five minutes prior to his death. Folks, I ask you to do something. If any of you have a second hand on your watch, go back to the jury room and sit in silence, total silence for two minutes, not five, just two, and I suggest *850 to you it is going to seem like an eternity to sit there and look at one another for two minutes. Contemplate [the victim] and the time he spent, not two minutes, but closer to five minutes with his throat cut, bleeding profusely, then with [the defendant] continuing the attack by repeatedly stabbing him in the chest with enough force to go through his body to the back five times breaking bones, with enough force in his back to have nine of the eleven stab wounds, again, through his breaking bones. And that two to five minutes to [the victim], I suggest to you, was like an eternity of pain, suffering and hell.
928 So.2d at 1121. We denied the defendant’s claim, holding that the comments “did not so affect the fairness and reliability of the proceeding that confidence in the outcome is undermined.” Id. at 1122. The State’s comments here are not nearly as egregious as those made in - Davis. Moreover, unlike in Davis, the trial court admonished the State and gave a curative instruction to the jury. Therefore, although improper, the State’s golden rule argument did not merit a mistrial. Accordingly, we affirm the trial court’s ruling.
Braddy also challenges the State’s comments depicting the period that Quatisha rode in the Town Car alone with Braddy:
What happens? It’s dark and they are driving. And they are driving, and they are driving, and they are driving.
Where’s mommy? Where’s mommy?
Braddy made a nonspecific objection on the grounds of “[improper argument,” that the trial court overruled. Braddy’s claim on appeal that this was an imaginary first-person script that constituted a golden rule argument was therefore not preserved. See Jones v. State, 760 So.2d 1057, 1058 (Fla. 4th DCA 2000) (holding that objection on grounds of “[i]mproper argument” “did not apprise the trial court of the precise argument made here”).
We have condemned the use of arguments that present imaginary first-person scripts. See Urbin, 714 So.2d at 421 (holding improper the State’s comments, “Don’t hurt me. Take my money, take my jewelry. Don’t hurt me.”); Garron v. State, 528 So.2d 353, 359 (Fla.1988) (holding that the State’s comments that “[i]f [the victim] were here, she would probably argue the defendant should be punished for what he did,” and “listen to the screams and to her desires for punishment for the defendant” were improper) (footnotes omitted). The State’s comments here did not depict the victim pleading for her life, nor did they portray the victim calling out for justice from beyond the grave. Given the totality of the evidence presented regarding the circumstances of Quatisha’s death, the four words illustrating the confusion that Quati-sha had leading up to her death — “Where’s mommy? Where’s mommy?” — did not deprive Braddy of a fair penalty phase. In itself, this comment does not constitute fundamental error.
3. “Easy Way Out” Comment
Braddy next challenges the State’s argument that a life sentence was not appropriate given the facts of the case. During closing argument, the State argued that it was not the jury’s duty to do *851 Braddy argues that this argument is a “near carbon-copy” of arguments that we have previously held impermissible. Because Braddy failed to preserve this issue for appeal, we review the State’s comments for fundamental error.
*850 what’s good enough ... [but] what’s appropriate. That’s what you have been charged with doing as a jury, as a jury in this state, as sworn jurors, as people who have sworn to follow the law as it is set out in these instructions. That’s your job. Not to do what’s good enough. Not to do what’s easy. Your job is to do the hard one. Your job is to give him the consideration he’s entitled to and the State the consideration that it’s entitled to.
*851 Braddy points to our decision in Urbin to support his argument. In Urbin, we held that the State’s comments to the jury that “my concern is that some of you may be tempted to take the easy way out, to not weigh the aggravating circumstances and the mitigating circumstances” was improper argument. 714 So.2d at 421. Recently, however, we distinguished between the impermissible comments made in Ur-bin and similar but permissible comments. Wade v. State, 41 So.3d 857, 870-71 (Fla.2010), cert. denied, — U.S. -, 131 S.Ct. 1004, 178 L.Ed.2d 835 (2011). In Wade, the State told the jury:
You might hear an argument about life is enough. Life is however many years he’s got left and leaves that prison only when he dies. What I suggest to you is that argument tells you that this defendant should not be held fully accountable for his actions. The argument in essence says let’s take the easy way out. I know life is life and I know it will be a miserable life in prison and let’s give him life, but that’s not the law of the State of Florida. You have to weigh and weigh this aggravation and you will find that it cries out for full accountability-
41 So.3d at 870 (emphasis in original omitted). In rejecting the defendant’s argument that this language was “nearly identical to arguments we previously deemed impermissible in cases such as Urbin,” we highlighted “an important difference between the two cases.” Id. at 871.
In Wade, the State “correctly told the jurors that it was their duty actually to weigh the factors,” whereas the rejected comments in Urbin and similar cases “implied that the jury was required by law to return a recommendation of death.” Id. (citing Urbin, 714 So.2d at 421). Here, the State encouraged the jury not to opt for a life sentence just because it was “good enough,” but to consider the aggravation as required by Florida law. As in Wade, the State correctly told jurors to give both Braddy and the State the consideration each was entitled to by following the law as it was set out in the jury instructions. Thus, as in Wade, we reject the contention that the State’s argument was improper.
4. Attacking Braddy’s Character
Braddy next challenges the State’s comment describing Braddy as “violent ... since birth” and the State’s comments characterizing Braddy as a bad husband who was unfaithful to his wife. Braddy made no objection at trial to the former comment and made only nonspecific objections to the latter comments.
a. Violent Since Birth
In attempting to establish the aggravating factor that Braddy had been convicted of violent felonies, the State told jurors that
[Braddy] has previously been convicted of a violent felony. Not one, not two. Twelve. Four separate crimes, four separate dates. This is a guy who cannot live out in the community without hurting someone.
Now, ladies and gentlemen of the jury, you don’t just wake up one morning and say I’m going to be violent today. I will submit to you that this has been since birth. He’s been this way since birth. And no matter what he says or no matter what he does with his family, this is cruel, heinous.
Because Braddy failed to object to these comments at trial, we review them for fundamental error. See Brooks, 762 So.2d *852 at 898-99. We have previously held that characterizing the defendant as a violent person can violate the prohibition against “impermissibly inflam[ing] the passions and prejudices of the jury with elements of emotion and fear.” Brooks, 762 So.2d at 900; see also Urbin, 714 So.2d at 420 n. 9. Here, however, the State’s comments do not rise to the level of those which we have previously deemed impermissible.
In Brooks, we held that the State improperly characterized the defendants as violent persons by pervasive use of phrases such as “true deep-seated, violent character,” “people of longstanding violence,” “they commit violent, brutal crimes of violence,” “it’s a character of violence,” and “both of these defendants are men of longstanding violence, deep-seated violence, vicious violence, brutal violence, hard violence ... those defendants are violent to the core, violent in every atom of their body.” 762 So.2d at 900. Similarly, in Urbin we held that the State improperly referred to the defendant’s “true, violent, and brutal and vicious character” and improperly cast the defendant as a “coldblooded killer, a ruthless killer,” who exhibited “deepseeded [sic] violence ... vicious violence ... brutal violence,” because he was “violent to the core, violent in every atom of his body.” Urbin, 714 So.2d at 420 n. 9.
Here, the State properly introduced evidence at Braddy’s penalty phase trial establishing that Braddy had a violent character, in response to Braddy’s attempt to characterize himself as a nonviolent person. See Gore v. State, 784 So.2d 418, 438 (Fla.2001) (holding that the State may present evidence during penalty phase to rebut defense’s evidence of defendant’s nonviolent nature). At closing, the State drew on the facts in evidence to argue that Braddy had caused trouble as a child and had then gone on to an adult life full of violent crime. The State argued that these facts demonstrated that Braddy had been violent “since birth” and “cannot live out in the community without hurting someone.” The State’s comments were therefore not the type of colorful, repetitive descriptions that we deemed impermissible in Brooks and Urbin and were not improper.
b. Unfaithful Husband
Braddy also challenges the State’s comments characterizing Braddy as a bad husband who was unfaithful to his wife. During the State’s penalty phase cross-examination of Cyteria, the State asked several questions aimed at establishing that Braddy had engaged in extramarital affairs, specifically naming two women as possible objects of Braddy’s affection. Defense counsel’s repeated objections to this line of questioning were overruled, but because defense counsel failed to state a legal ground for any of the objections, the issue is not preserved for appeal. Then during closing argument, the State referred back to Cyteria’s testimony in general, arguing that Braddy was not a good husband because a
[g]ood husband is someone who’s there for his spouse. A good husband is someone who provides for his spouse. A good husband is not someone who’s out with others while his wife is raising the children.
Defense counsel likewise failed to preserve this issue, making only a nonspecific “improper argument” objection to these comments, which the trial court overruled. Braddy now claims that the State’s line of questioning during cross-examination of Cyteria impermissibly insinuated impeaching facts without evidence to support those facts and that the State’s comments at closing compounded the error by referring back to the improper “facts.”
*853 We agree that the State’s line of questioning about Braddy’s extramarital affairs constituted improper interrogation. “It is impermissible for the state to insinuate impeaching facts while questioning a defense witness without evidence to back up those facts.” Shimko v. State, 883 So.2d 341, 343 (Fla. 4th DCA 2004). This is true for questions “which insinuate impeaching facts, the proof of which is nonexistent,” and those “insinuating impeaching facts which, although said to exist, are not later proved.” Smith v. State, 414 So.2d 7, 7 (Fla. 3d DCA 1982) (noting that the difference between these types of questions “is one of degree only, and either interrogation, because not followed by actual impeachment, is condemnable”). Here, the State did not present any evidence that Braddy had engaged in extramarital affairs with either of the two women about whom it questioned Cyteria, and Cyteria denied any knowledge of the affairs alleged by the State. The State therefore insinuated impeaching facts that were not supported by any evidence and that were not corroborated by actual impeachment. However, because the State’s error concerns only a minor aspect of its case against Braddy — attempting to discredit one of several nonstatutory mitigating factors — it does not individually constitute fundamental error.
As to the State’s comments at closing, even if Braddy had made specific objections to these comments on the ground that they were improper attacks on his character, the trial court would have been justified in overruling the objections. The State’s comments were in direct response to Braddy’s attempt to characterize himself as a good husband and made no reference to the impermissible line of questioning. The evidence showed that Braddy had been in jail for several years while Cyteria was at home taking care of four children and pregnant with a fifth; that during this time Cyteria was the primary caregiver for her family; and that Braddy had attempted to have at least one extramarital sexual relationship — his relationship with Shandelle. The State’s comments at closing were therefore legitimate arguments based on facts in evidence. See Smith, 7 So.3d at 509.
5. Denigration of Defense
Braddy also challenges the State’s comments (1) that “[defense counsel] is going to get up here, and he’s — I know he’s going to scream about — I think he told you HAC, CCP”; (2) that defense counsel was “going to be arguing about the ones and screaming about the ones that they can. Because maybe if you scream loud enough, maybe you can drown out the shouts of the ones that are written in stone”; and (3) that defense counsel improperly attacked the testimony of the police in order to make it seem as though the police were lying in an attempt to establish certain aggravating factors, thereby implying defense counsel’s dishonesty and bolstering the testimony of the police. The trial court sustained defense counsel’s contemporaneous and specific objection to the first challenged comment, but counsel failed to move for a mistrial based on the comment and thus did not preserve the issue for appeal. The trial court also sustained defense counsel’s objection to the second comment, but because counsel only objected on the nonspecific grounds of “improper argument” and again failed to move for a mistrial, the comment is also unpre-served. The third set of challenged comments is also unpreserved because defense counsel failed to object to the comments at trial. We therefore review each comment for fundamental error.
Verbal attacks on the personal integrity of opposing counsel or on the manner in which counsel conducted the defense *854 are improper and have no role in the State’s case. See Merck v. State, 975 So.2d 1054, 1064 (Fla.2007) (holding that prosecutor’s comments denigrating evidence as part of “a mitigation strategy by [defense] counsel” were improper) (citing Redish v. State, 525 So.2d 928, 931 (Fla. 1st DCA 1988) for the proposition that “verbal attacks on personal integrity of opposing counsel are unprofessional and inconsistent with prosecutor’s role”). Such comments, though improper, do not necessarily vitiate the entire trial. See Chandler, 702 So.2d at 191 n. 5 (holding that prosecutor’s description in closing argument of defense counsel engaging in “ ‘cowardly’ and ‘despicable’' conduct” was not fundamental error); Merck, 975 So.2d at 1064 (holding that prosecutor’s statements denigrating manner in which defense counsel conducted defense, although improper, were “not the sort of pervasive errors that compromise[d] the integrity of the penalty-phase proceeding”).
By characterizing defense counsel on two occasions as “screaming about” contested aggravating factors in order to draw attention away from those factors “written in stone,” the State was improperly denigrating the manner in which defense counsel conducted Braddy’s defense. Likewise, regarding the third set of challenged comments, the State improperly characterized defense counsel’s cross-examination of Detective Hoadley as an “attack” designed to undermine an aggravating factor. Defense counsel is entitled to question the evidence presented by the State to establish aggravating factors. The State’s comments, however, are not the type of comments we have deemed to be fundamental error. See Merck, 975 So.2d at 1064.
6. Diminishing Mitigation
Finally, Braddy argues that the State improperly told the jury to treat mitigation evidence presented during Braddy’s penalty phase trial as nonstatuto-ry aggravation. During closing argument, the State noted that Braddy had “a lovely, lovely, lovely family” and claimed that Braddy was “privileged to be from this family.” The State then argued that Braddy’s “family highlights ... the fact that the aggravators outweigh the miti-gators.” Braddy objected to the State’s comments on a nonspecific “[i]mproper argument” ground, which the trial court overruled. The State continued, questioning why Braddy had presented mitigating evidence through the testimony of roughly a dozen family members when “[o]ne or two would have done it.” Braddy again— although not until the State had continued with this line of argument for three more sentences — raised a nonspecific “[improper argument” objection, which the trial court again overruled.
At the end of the State’s closing argument, Braddy moved for a mistrial based on the State’s comments:
[W]hen [the State] was arguing the mitigation, she improperly argued that in considering the mitigations, that what the mitigations actually presented was that there was nothing good about the defendant.
So she took the mitigation that should be presented to the jury and weighed accordingly, she turned it into a non-statutory aggravator through her arguments.
I think that rises to the level of mistrial....
The trial court denied Braddy’s motion:
I think that this is fair comments [sic] on the weight of the aggravator, it will obviously be mitigating. It will be up to the jury to weigh all the aggravators and all the mitigators that’s [sic] been *855 presented in the case. So the motion will be denied as to that point.
Given the context of the prosecutor’s argument, Braddy’s contemporaneous “improper argument” objections were not specific enough to ensure that the trial court clearly understood the nature of the objection. Braddy’s objections were therefore insufficient to preserve the issue for review. Aills v. Boemi, 29 So.3d 1105, 1109 (Fla.2010) (“While no magic words are required to make a proper objection, ... the concern articulated in the objection must be sufficiently specific to inform the court of the perceived error.”) Braddy’s motion for mistrial does not cure his failure to preserve this issue for appeal by way of a timely and specific objection. See Nixon v. State, 572 So.2d 1336, 1341 (Fla.1990) (holding that defense counsel’s motion for mistrial on the basis of improper golden rule argument — made at the end of the State’s closing argument — is insufficient to preserve the issue for appeal absent a contemporaneous objection); Castor v. State, 365 So.2d 701, 703 (Fla.1978) (noting that “[t]o meet the objectives of any contemporaneous objection rule, an objection must be sufficiently specific both to apprise the trial judge of the putative error and to preserve the issue for intelligent review on appeal”). We therefore review Braddy’s claim for fundamental error.
We previously rejected a claim nearly identical to the one Braddy raises here. In Moore v. State, 701 So.2d 545 (Fla.1997), the State argued at closing:
I would submit to you that the Defense put on a lot of mitigation. They brought in, as I told you, all of the wonderful people who had known this defendant his entire life, who had nurtured him, who loved him, who spent holidays with him, who said that he was treated just like their son, their brother, their cousin. That he did well in school. That he played football. That he had a normal life. And, ladies and gentlemen, it may sound like mitigation, but to me it’s the most — well, I would submit to you that it’s the most aggravating factor of all.
701 So.2d at 551. We held that the judge did not abuse his discretion by allowing the State’s comments, which fell within the wide latitude permitted when arguing to the jury. Id. We reasoned that because the judge properly instructed the jury on the purpose of closing argument as well as on the nature of aggravating and mitigating circumstances, the State’s comments were not “of such a nature as to taint the jury’s recommendation of death.” Id. As in Moore, the trial court below properly instructed the jury that closing arguments were not to be considered as evidence. The court also properly instructed the jury on aggravation and mitigation. We therefore affirm the trial court’s ruling.
7. Cumulative Error Analysis
Having considered the issue raised by Braddy and the totality of the State’s penalty phase closing argument, we have identified four areas of concern: (1) the prosecutor’s comment on “the determination ... that the State has to make in bringing a case like this to you as a death penalty case”; (2) the prosecutor’s arguments depicting Quatisha’s fear using the pronoun “you” and possible first-person script; (3) the prosecutor’s line of questioning regarding Braddy’s alleged affairs with two women; and (4) the prosecutor’s denigration of defense counsel’s strategy. Additionally, we conclude that the prosecutor’s golden rule argument inviting the jurors to imagine Quatisha’s fear for five minutes was improper. We determine that none of these comments individually requires reversal. Assuming these arguments to be improper, we determined that they do not individually constitute funda *856 mental error. We now consider whether the cumulative effect of any improper comments has denied Braddy of his right to a fair penalty phase trial. See Card, 808 So.2d at 622.
Upon consideration of the entirety of the State’s remarks, we conclude that Braddy is not entitled to a new sentencing proceeding. The prosecutor’s reference to “the determination ... that the State has to make” is tempered by the State’s admonition that the jury must find each aggra-vator beyond a reasonable doubt. Likewise, the trial court sustained Braddy’s objection to the most egregious golden rule argument — and cautioned the jury appropriately, thereby diminishing the prejudicial effect of the statement — and defense counsel failed to object to the other similar but less prejudicial arguments. Nor does the prosecutor’s argument regarding Braddy’s possible mistresses and denigration of defense counsel’s trial strategy go to the heart of Braddy’s case.
We have declined to find cumulative fundamental error in similar cases. In Card, for example, we concluded that the State’s penalty phase closing argument errors did not deprive the defendant of a fair penalty phase where “the prosecutor crossed the line of proper advocacy during closing argument.” 803 So.2d at 622. We noted that defense counsel failed to object to several of the improper arguments and that the trial court had appropriately cautioned the jury after at least one improper comment. We further noted that the trial court had found five aggravators — including CCP and HAC — “no statutory mitigation, and insignificant nonstatutory mitigating circumstances.” Id. at 623. We held that based on these circumstances, “closing argument errors did not compromise the integrity of the judicial process and did not deprive Card of a fair penalty phase hearing.” Id.
We likewise hold today that given the full context of the penalty phase trial, any errors in the State’s closing argument did not deprive Braddy of a fair penalty phase.
I. Mitigation
Braddy argues that the trial court erred by requiring him to argue all of his nonstatutory mitigating evidence as a single mitigating factor, thus distorting the weighing process in the face of five aggravating factors. Braddy does not claim, however, that the trial court failed to properly consider and give weight to each of his nonstatutory mitigating factors. Brad-dy’s claim is without merit.
Before penalty phase closing arguments began, the trial court denied Braddy’s motion to list thirty nonstatutory mitigating factors as a numeric list to be presented to the jury, noting that Braddy would have “an opportunity to argue each one of these things as something that the jury can consider based upon the evidence that’s been presented.” During its penalty phase closing argument, defense counsel referred to several of the nonstatutory mitigating factors and described the weighing process as analogous to placing money on a scale. After the trial court sustained the State’s objection to this analogy, defense counsel nonetheless continued to mischaracterize the weighing process. At a sidebar conference prompted by a second objection, the following exchange took place:
THE COURT: I think the cause for her objection is that you’re equating each one of those items, 20 or 25 items, as separate mitigating factors.
It’s sort of misleading because they are 25 items that are incorporated in one mitigating circumstance, that is any evidence of the character or background of the defendant....
*857 [DEFENSE COUNSEL]: It’s not misleading, Judge. It’s what the law says.
THE COURT: No, it is misleading, sir, because I said it was. We already talked about that.
[DEFENSE COUNSEL]: Are you precluding me from arguing this point?
THE COURT: No, I’m just trying to tell you that the law says that you can’t do it in terms of there are 25 separate mitigating factors. There are 25 items that are incorporated into one mitigating factor. While you can talk about each one of them and, you know, the import of each one of them, you can’t make it sound like they are separate mitigating factors. That’s my only problem.
We agree with the trial court’s statement of the law.
The Florida Criminal Punishment Code provides that for purposes of capital sentencing, “[m]itigating circumstances shall be the following” eight circumstances. § 921.141(6), Fla. Stat. (2010). The last in this list of mitigating circumstances is “[t]he existence of any other factors in the defendant’s background that would mitigate against imposition of the death penalty.” § 921.141(6)(h).[9] The plain language of the statute therefore establishes that although a defendant may present many separate factors to be considered as mitigation pursuant to section 921.141(6)(h), those factors comprise one mitigating circumstance. Here, the trial court allowed defense counsel to argue each of the non-statutory mitigating factors to the jury and expressly considered each of the factors in its sentencing order.[10] The trial court’s ruling prevented defense counsel from improperly engaging in a quantitative analysis of mitigation and aggravation. See, e.g., Taylor v. State, 937 So.2d 590, 601 (Fla.2006) (holding that the process of weighing aggravating and mitigating circumstances during capital sentencing proceedings is not a quantitative comparison). Accordingly, we affirm the trial court’s ruling.
J. Victim Impact Evidence
We review a trial court’s admission of victim impact testimony for abuse of discretion. Deparvine v. State, 995 So.2d 351, 378 (Fla.2008). We have previously held that victim impact testimony is admissible as long as it falls within the parameters set by the United States Supreme Court in Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Windom v. State, 656 So.2d 432, 438 (Fla.1995). “Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question.” Payne, 501 U.S. at 825, 111 *858 S.Ct. 2597. “In the majority of cases ... victim impact evidence serves entirely legitimate purposes,” but “[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief.” Id. “The analysis to determine if admission of victim impact evidence has violated a defendant’s due process rights in the penalty phase of a capital trial parallels the analysis for fundamental error.” Wheeler v. State, 4 So.3d 599, 607 (Fla.2009).
Braddy argues that by allowing the State to introduce evidence that Shan-delle had contracted Crohn’s disease, the trial court caused undue prejudice to Brad-dy in violation of his due process rights. Braddy claims that contracting Crohn’s disease was not a foreseeable consequence of his crimes, especially given that Crohn’s disease is a genetic immunological defect. Regardless of whether it was foreseeable that Shandelle would contract Crohn’s disease from the stress of her experience and loss of her daughter, this relatively minor piece of evidence does not render Braddy’s sentencing fundamentally unfair in light of the totality of evidence presented at his penalty phase trial. We deny his claim.
K. Prior Felony Convictions
 Braddy next contends that the trial court erred by allowing the State to introduce at his penalty phase trial inadmissible hearsay evidence of his prior violent felony convictions. Over Braddy’s objection,[11] the trial court allowed the State to introduce — through the testimony of Detective Suco — the arrest affidavit and plea colloquy from Braddy’s convictions for armed burglary, robbery, and kidnapping related to his 1984 crimes against the Coles. We review the trial court’s decision to admit evidence under an abuse of discretion standard. Hudson, 992 So.2d at 107. “In determining whether a trial court has abused its discretion in admitting evidence of prior violent felony convictions, this Court looks at the tenor of the witnesses’ testimony and whether this testimony became a central feature of the penalty phase.” Franklin v. State, 965 So.2d 79, 96 (Fla.2007) (citing Cox v. State, 819 So.2d 705, 715-16 (Fla.2002)). We hold that the trial court did not abuse its discretion by allowing the State to introduce the arrest report, affidavit, and plea colloquy from Braddy’s conviction for his crimes against the Coles.
In setting forth the procedural rules governing penalty phase trials for defendants sentenced to death or life imprisonment for capital felonies, section 921.141(1) provides, in relevant part:
In the [penalty phase] proceeding, evidence may be presented as to any matter that the court deems relevant to the nature of the crime and the character of the defendant and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (5) and (6). Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided the *859 defendant is accorded a fair opportunity to rebut any hearsay statements.
§ 921.141(1), Fla. Stat. (2006) (emphasis added). The evidence challenged by Brad-dy was presented by the State in order to establish that Braddy “was previously convicted of ... a felony involving the use or threat of violence to the person,” an enumerated aggravating circumstance under section 921.141(5). In overruling Braddy’s objection to the evidence, the trial court expressly noted that the documents were admissible as “evidence of a prior violent crime.” The trial court also provided Braddy a fair opportunity to rebut the hearsay statements contained in the evidence, ruling that defense counsel could introduce depositions given by the Coles in order to challenge the evidence presented through Detective Suco.
Moreover, in presenting the affidavit and plea colloquy, Detective Suco simply read the details of the crime as recorded in the arrest affidavit. There is no indication that Detective Suco made any kind of emotional display. Nor can it be said that the testimony was the central feature of the penalty phase, because the State presented evidence of two additional prior violent crimes as well as victim impact testimony, including by Shandelle. The trial court was thus well within its discretion in admitting the arrest affidavit and plea colloquy. See Franklin, 965 So.2d at 96-97 (holding that evidence of prior violent felony was properly admitted where there was no evidence of emotional display by witnesses and testimony was not central feature of penalty phase); Cox, 819 So.2d at 715-16 (holding that evidence of prior violent felonies was properly admitted where “witnesses tersely related the crimes committed against them, and each was able to do so without any emotional display,” and prior offenses did not become a central feature of penalty phase).
Braddy also argues that the trial court’s ruling violated his constitutional right to confront his accusers. Because Braddy failed to object to the evidence on this ground at trial, the issue is unpreserved and we review it for fundamental error.
While it is true that Braddy’s “Sixth Amendment right of confrontation applie[d] to all three phases of [his] capital trial,” Rodriguez v. State, 753 So.2d 29, 43 (Fla.2000), we have “previously recognized that admissions by acquiescence or silence do not implicate the Confrontation Clause.” Globe v. State, 877 So.2d 663, 672 (Fla.2004). A guilty plea includes a confession to the acts which constitute the crime. McCrae v. State, 395 So.2d 1145, 1154 (Fla.1980) (quoting Boykin v. Ala., 395 U.S. 238, 242, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969): “A plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction.”).
Braddy claims that in pleading guilty, neither he nor his then attorney stipulated to the truthfulness or admissibility of the hearsay within the affidavit. Braddy points specifically to the following exchange, which occurred during the hearing in which Braddy pleaded guilty to the charges laid against him for his crimes against the Coles:
[THE COURT:] Will you accept as a factual basis the probable cause affidavit the police brought out?
THE DEFENDANT: I haven’t seen it.
[DEFENSE COUNSEL]: But, Judge, yes, we stipulate to the probable cause affidavit as well as the Information in terms of what the State would present at trial against Mr, Braddy.
Despite Braddy’s contention that his then counsel’s stipulation to the arrest affidavit did not constitute a stipulation to “the *860 truthfulness or admissibility” of the facts contained therein, the law is nonetheless clear “that a plea of guilty is an in-court confession.” Robinson v. State, 873 So.2d 898, 902 (Fla.1979). Because Braddy does not contest the validity of his guilty plea, the language by which Braddy — through his counsel — stipulated to the facts contained in the affidavit is irrelevant. The trial court’s ruling did not violate Braddy’s Confrontation Clause rights and no fundamental error therefore occurred.
L. Ring Claim
We have repeatedly rejected claims based on Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), where the prior violent felony aggravating factor is present. See, e.g., Deparvine, 995 So.2d at 379 (rejecting defendant’s Ring claim because “it is undisputed that he has prior felony convictions and this Court has held that the existence of such convictions as aggravating factors moots any claim under Ring ”); Frances v. State, 970 So.2d 806, 822 (Fla.2007) (noting that “[t]his Court has repeatedly relied on the presence of the prior violent felony aggravating circumstance in denying Ring claims”). Here, the trial court found the existence of the prior violent felony aggra-vator based on Braddy’s 1984 crimes against the Coles, Davis, and Bermudez. Moreover, we have previously held that a defendant is not entitled to relief under Ring where the trial court found the contemporaneous felony aggravator. Reese v. State, 14 So.3d 913, 920 (Fla.2009). Here, the trial court found the contemporaneous felony aggravator based on Braddy’s conviction for kidnapping Quatisha. We therefore deny Braddy’s claim.
M. Cumulative Error Analysis
Braddy contends that the cumulative effect of the errors in this case — as discussed in sections A through L above— deprived him of due process of law and a reliable sentencing process. “Where multiple errors are found, even if deemed harmless, ‘the cumulative effect of such errors’ may ‘deny to defendant the fair and impartial trial that is the inalienable right of all litigants.’ ” Hurst v. State, 18 So.3d 975, 1015 (Fla.2009) (quoting Brooks v. State, 918 So.2d 181, 202 (Fla.2005) (Brooks II)). We have identified three potential errors within the prosecutor’s guilt phase closing argument and four within the prosecutor’s penalty phase closing argument — discussed above in sections F and H, respectively. Having closely examined the record and considered the totality of evidence presented at Braddy’s trial, we hold that the cumulative effect of any errors did not deprive Braddy of a fair trial.
We have previously held that the cumulative effect of multiple harmless errors did not amount to fundamental error where the errors shared three decisive factors: “(1) none of the errors were fundamental; (2) none went to the heart of the state’s case; and (3) the jury would have still heard substantial evidence in support of the defendant’s guilt.” Brooks II, 918 So.2d at 202 (citing Jackson v. State, 575 So.2d 181, 189 (Fla.1991)). In Brooks II, 918 So.2d at 202, we “determined that five errors of law occurred during the course of Brooks’ retrial” for two counts of first-degree murder and corresponding sentences of death, and in Jackson, 575 So.2d at 189, we determined that three such errors had occurred. In both of those cases, based on the three decisive factors listed above, we held that — in light of the totality of the evidence against the defendant — there was no reasonable possibility that the cumulative effect of the errors contributed to the conviction. Brooks II, 918 So.2d at 202; Jackson, 575 So.2d at 189.
*861 The same decisive factors are present here. None of the identified errors are fundamental. We have already examined the allegations of error made regarding the State’s guilt and penalty phase closing arguments and have determined that any errors made in each closing argument did not individually or cumulatively constitute fundamental error for that portion of Braddy’s trial. Nor do any of the errors go to the heart of the State’s case against Braddy. See Jackson, 575 So.2d at 189 (noting that errors “ancillary to the facts linking [the defendant] to the crime” do not “go to the heart of the state’s case”). As the trial court instructed the jury prior to each closing argument, comments made therein — whether proper or not — are not evidence in the State’s case against Brad-dy. Finally, the jury would have heard substantial evidence of Braddy’s guilt absent the errors. The jury still would have heard Shandelle’s first-person account of the night that Quatisha was killed and would have heard other abundant evidence of Braddy’s guilt, including through the testimony of several police officers and the medical examiner who performed an autopsy on Quatisha’s body. Considering the weight of the errors and the magnitude of the totality of evidence against Braddy, we conclude that there is no reasonable possibility that any errors at Braddy’s trial deprived him of his right to a fair trial.
N. Sufficiency
In cases involving the death penalty, we independently review the record to ensure that the jury’s verdict is supported by competent, substantial evidence. Fla. R.App. P. 9.142(a)(5). Here, the jury, having been instructed on both premeditation and felony murder, convicted Braddy of first-degree murder by general verdict. “A general guilty verdict rendered by a jury instructed on both first-degree murder alternatives may be upheld on appeal where the evidence is sufficient to establish either felony murder or premeditation.” Crain v. State, 894 So.2d 59, 78 (Fla.2004). Here, there is sufficient evidence to support both theories of guilt.
The evidence at trial established that Braddy took both Shandelle and Qua-tisha from their home after getting into a fight with Shandelle and choking her unconscious. Braddy admitted that he knew he was kidnapping them, which concerned him because he knew it was a life felony. The evidence further established that, after Braddy took Shandelle out of the trunk and choked her unconscious on a desolate road, Shandelle never saw Quatisha alive again. Testimony from Shandelle’s landlord confirmed that Braddy had been seen with Quatisha the night she disappeared. Furthermore, Braddy confessed several times to having left Quatisha alone in the Everglades after disposing of Shandelle and eventually led the detectives to the area where Quatisha’s body was later found.
The evidence also established that Brad-dy asked, on more than one occasion, how long it would take a body that had been submerged to float to the surface. Moreover, Braddy admitted that Quatisha was possibly or even probably dead by the time that he took detectives to look for her and said he knew when he left her that she would probably die. Braddy stated that he had left Quatisha alone out in the Everglades in the middle of the night because she knew his name and would tell other people what he had done to Shandelle. Finally, the evidence established that the primary cause of Quatisha’s death was severe trauma to her head, consistent with either being thrown or having fallen with some force onto the rocks that lined the canal where Quatisha was found. The nature of her death was ruled by the medical examiner to be a homicide.
*862 The jury could reasonably have found, based on the totality of the evidence, that Braddy killed Quatisha or left her alone in the middle of the Everglades, intending to affect her death. Because Braddy admitted that he kidnapped Quatisha, the evidence supports the theory that Quatisha’s death occurred during the commission of a felony. Likewise, because Braddy admitted that he had left Quatisha in the middle of the Everglades because he did not want her to tell anyone what he had done to her mother, the evidence also supports the theory that Quatisha’s murder was premeditated in order to eliminate her as a witness. The evidence is therefore sufficient to support Braddy’s conviction for first-degree murder.
0. Proportionality
To ensure uniformity in application of the death penalty, we review a death sentence for proportionality “regardless of whether the issue is raised on appeal.” Muehleman v. State, 3 So.3d 1149, 1166 (Fla.2009) (quoting England v. State, 940 So.2d 389, 407 (Fla.2006)); see also Fla. R.App. P. 9.142(a)(5). “[T]he death penalty is reserved only for those cases where the most aggravating and least mitigating circumstances exist.” Muehleman, 3 So.3d at 1166 (internal quotation marks omitted) (quoting Terry v. State, 668 So.2d 954, 965 (Fla.1996)). We do not simply perform “a quantitative analysis of the number of aggravators versus the number of mitigators,” but “a qualitative review of the basis for each aggravator and miti-gator.” Id. (quoting Urbin, 714 So.2d at 416) (internal quotation marks omitted).
Here, the trial court found and gave great weight to five aggravators: (1) the victim of the capital felony was a person less than twelve years of age; (2) the capital felony was committed while the defendant was engaged in the commission of a felony crime, to wit: kidnapping; (3) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody; (4) the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification; and (5) the defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to another person. The trial court found no statutory mitigators and gave only little or moderate weight to eight nonstatutory mitigators: (1) Braddy had adjusted well to prolonged confinement in his previous incarcerations and might possibly be rehabilitated — little weight; (2) the sentence of life imprisonment was available to the court — little weight; (3) Braddy conducted himself in an appropriate manner at trial— moderate weight; (4) the friends in Brad-dy’s life considered him to be of value— little weight; (5) Braddy’s wife and children supported him unconditionally — moderate weight; (6) Braddy’s execution would presumably have an extreme impact on his family and friends — little weight; (7) Braddy’s parents and siblings considered him to be an important member of the family and believed that his life could be of value to other members of the family — little weight; and (8) Braddy attended church and professed dedication to Christian principles and beliefs — little weight. After considering both the aggravating and mitigating factors, we hold that Brad-dy’s sentence is proportionate to death sentences that we have upheld in other cases.
For example, in Cox v. State, 819 So.2d 705, 723-24 (Fla.2002), we upheld the death penalty where the trial court found and gave great weight to HAC, CCP, prior violent felony, and under sentence of imprisonment, while giving little or moderate weight to several nonstatutory mitigators. *863 Likewise, in Sliney v. State, 699 So.2d 662, 667 (Fla.1997), this Court upheld a death sentence imposed after the trial court gave great weight to two aggravators — committed during course of felony and for purpose of avoiding lawful arrest — and only little or moderate weight to two statutory mitigators and several nonstatutory miti-gators. See also, Mansfield v. State, 758 So.2d 636, 646-47 (Fla.2000) (affirming death sentence where trial court found HAC and during course of sexual battery and several nonstatutory mitigators); James v. State, 695 So.2d 1229, 1237-38 (Fla.1997) (affirming death sentence where trial court found HAC, prior violent felony, and during course of felony and several statutory and nonstatutory mitigators); LaMarca v. State, 785 So.2d 1209, 1217 (Fla.2001) (upholding death penalty where only prior violent felony aggravator was present). Braddy’s sentence is consistent with this precedent.
CONCLUSION
Therefore, having considered all of Braddy’s claims as discussed above, we affirm his convictions and sentences.
It is so ordered.
POLSTON, C.J., and CANADY, LABARGA, and PERRY, JJ., concur.
LEWIS, J., concurs in result.
PARIENTE, J., dissents with an opinion, in which QUINCE, J., concurs.
QUINCE, J., dissents with an opinion, in which PARIENTE J., concurs.

. Detective Suco testified that he attempted to locate the Coles at the address where the crimes had occurred but that they no longer lived there and he "could not find them.” Detective Suco stated that he did not know if the Coles were dead or alive but presumed them to be dead based on their advanced age at the time of the crime and the twenty-three years that had since passed.

. Although the trial court’s sentencing order states that the defense waived all statutory mitigation with the exception of section 921.141 (6)(h), the sentencing order nonetheless considers and gives no weight to "[t]he age of the defendant at the time of the crime” — a statutory mitigating factor pursuant to section 921.141(6)(g). This discrepancy is due to the fact — as explained in the sentencing order — that although Braddy did not present evidence to the jury or the court regarding this mitigating factor, he did reference the factor in his sentencing memorandum.
Additionally, due to an apparent clerical error, the sentencing order lists Braddy’s age at the time of the crime — which was in fact forty-nine — as fifty-eight, which was Braddy’s age at the time of trial and sentencing.

. Braddy’s original "Motion to Suppress Written and/or Oral Statements” filed on May 21, 2007, was superseded by his amended motion filed on June 4, 2007.

. Braddy's claim that he served a copy of the October 11 motion on the judge in open court during a pretrial conference held that day is refuted by the record.

. Braddy claims that his October 11 motion also references an incident in which the trial court refused to provide Braddy with stamps so that Braddy could mail his pro se pleadings as needed. Braddy's motion makes reference to no such event.

. Although Braddy also challenged his conviction for child neglect on this basis in his motion for acquittal, he raises no such challenge before this Court.

. Braddy raises the issue of golden rule arguments in his challenge to the State's penalty phase closing argument but therein includes a challenge to comments made during the State’s guilt phase closing argument as well. We discuss those challenged comments present in the guilt phase closing argument here and those present in the penalty phase closing argument in section H below.

. For purposes of section 944.40, confinement sufficient for a conviction of escape or attempted escape can begin as early as when an individual is placed under arrest, before he is even physically restrained. See Spann v. State, 996 So.2d 873, 874 (Fla. 4th DCA 2008). Thus, because Braddy had been physically restrained and in the custody of police *846 for several hours, and was in a locked interview room at the police station, he was confined for purposes of the escape statute.

. Mitigating factors proffered pursuant to section 921.141(6)(h) are often referred to — as we do today' — as "nonstatutory” factors. See, e.g., Foster v. State, 778 So.2d 906, 912 n. 7 (Fla.2000) (referring to mitigators submitted pursuant to section 921.141(6)(h) as nonstatu-tory and noting that the defendant referred to them as such, whereas the trial court treated them as statutory mitigators pursuant to section 921.141 (6)(h)).

. Braddy listed a total of sixty-seven nonstat-utory mitigating factors in his sentencing memorandum, which the trial court then grouped into nine categories by topic. We have repeatedly upheld such action. See Ault v. State, 53 So.3d 175, 194 (Fla.2010) (plurality opinion holding that trial court did not err by grouping twelve mitigating factors together as single nonstatutory mitigating circumstance), petition for cert. filed, No. 11-5120 (U.S. June 2, 2011); Kearse v. State, 770 So.2d 1119, 1133 (Fla.2000) (holding that trial court did not abuse discretion by grouping thirty-four proposed mitigators into single category); Reaves v. State, 639 So.2d 1, 6 (Fla.1994) (holding that trial court reasonably consolidated several proposed mitigating factors into three categories).

. Braddy first objected to the introduction of the evidence in a motion in limine prior to the start of his penalty phase trial, on the grounds that the evidence constituted inadmissible hearsay. At trial, Braddy merely renewed his objection to the evidence on the grounds “previously discussed.” Braddy’s objection is preserved by virtue of his objection before trial. § 90.104(1), Fla. Stat. (2006) ("If the court has made a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal.”).